# EXHIBIT 1





# AWARD

International Chamber of Commerce (ICC) | Secretariat of ICC International Court of Arbitration          **iccwbo.org/arbitration**

**Paris**
33-43 avenue du Président Wilson
75116 Paris, France
+33 (0)1 49 53 28 28   arb@iccwbo.org

**New York**
in affiliation with Sicana, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
+1 646 699 5704   ica9@iccwbo.org

**Singapore**
in affiliation with SICAS
28 Maxwell Road #02-01, Maxwell Chambers
Suites, Singapore 069120
+65 6983 5580   ica11@iccwbo.org

**Hong Kong**
Room 102, 1/F., West Wing, Justice Place,
11 Ice House Street, Central, Hong Kong
+852 3954 9504   ica8@iccwbo.org

**Sao Paulo**
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo, Brazil
+55 11 3040 8830   ica10@iccwbo.org

**Abu Dhabi**
ADGM Square, Level 20, Al Maqam Tower
Al Maryah Island, P.O. Box 111999
Abu Dhabi, United Arab Emirates
+971 56 333 2781   ica12@iccwbo.org

**ICC INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 27260/PDP**

NOVARTIS PHARMA AG

(Switzerland)

**vs/**

GENENTECH, INC.

(U.S.A.)

This document is the original of the Final Award rendered in conformity with the Rules of Arbitration of the International Chamber of Commerce and issued as an electronic document pursuant to the parties' agreement.

---

**ICC CASE NO. 27260/PDP**

**INTERNATIONAL COURT OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF COMMERCE**

---

**NOVARTIS PHARMA AG**
**(Switzerland)**

                                                              **CLAIMANT**

**vs.**

**GENENTECH, INC.**
**(U.S.A.)**

                                                              **RESPONDENT**

---

*MAY CONTAIN ATTORNEYS' EYES ONLY INFORMATION*

---

**FINAL AWARD**

(issued pursuant to the 2021 Rules of Arbitration
of the International Chamber of Commerce)

**Members of the Tribunal**
Fabien Gélinas (President)
John Fellas
Robert S. Smith



**Key Terms**

| Term | Definition |
|---|---|
| 2003 LCA | License and Collaboration Agreement, between Genentech, Inc. and Novartis Ophthalmics AG, dated June 20, 2003 (C-1) |
| 2019 LCA | Amended and Restated License and Collaboration Agreement, between Genentech, Inc. and Novartis Pharma AG, dated May 28, 2019 (C-2) |
| LCAs | The 2003 LCA and 2019 LCA, collectively |
| ANG-2 | Angiopoietin-2, one of the proteins bound by the bispecific antibody faricimab |
| antibody | A protein with a characteristic Y-shaped structure that binds an antigen |
| anti-VEGF | Targeting and inhibiting VEGF to prevent the abnormal formation of new blood vessels |
| Avastin® | A pharmaceutical product sold by Genentech containing the anti-VEGF antibody bevacizumab as the active ingredient, approved for the treatment of certain cancers |
| bevacizumab | The anti-VEGF antibody that is the active ingredient in Avastin® |
| binding specificity | An antibody's ability to bind one antigen or epitope with a greater binding affinity relative to other antigens or epitopes |
| bispecific antibody | An antibody with two unique Fab region amino acid sequences, each of which binds to a unique antigen |
| Court | International Court of Arbitration of the International Chamber of Commerce |
| DME *or* DMO | Diabetic macular (o)edema, a disorder of the eye treated by inhibiting VEGF |
| epitope | The region of the antigen that is bound by an antibody's Fab region |
| Fab | "Fragment antigen binding": an antibody fragment that includes the regions responsible for binding to an antigen |



| | |
|---|---|
| faricimab | A bispecific antibody containing an anti-VEGF arm, which is the RhuFabV2 sequence with one amino acid substitution |
| FDA | U.S. Food and Drug Administration |
| Field | As defined in the LCAs, "the treatment of diseases or disorders of the human eye and/or the retinal and/or the choroidal vasculature" C-1, 2003 LCA § 1.42; C-2, 2019 LCA at -0141 |
| glycosylation | The process in which a carbohydrate, *i.e.*, glycan, is chemically linked to a protein, which can impact the protein's stability, function, and half-life |
| intravitreal injection | The administration of a drug product directly into a patient's eye |
| Licensed Product | As defined in the LCAs, "a RhuFabV2 Antibody and any formulation thereof (including, without limitation, any lyophilized solid, liquid, or sustained release formulation containing a RhuFabV2 Antibody)." C-1, 2003 LCA § 1.70; C-2, 2019 LCA at -0144 |
| Lucentis® | A pharmaceutical product sold by Novartis and Genentech containing the anti-VEGF antibody fragment ranibizumab as the active ingredient, approved for treatment of disorders of the eye |
| pegylation | The chemical linkage of polyethylene glycol (PEG) to a protein to increase its half-life |
| ranibizumab | The RhuFabV2 anti-VEGF antibody sequence as a standalone fragment, which is the active ingredient in Lucentis® |
| RG7716 or RG-7716 | Faricimab, a bispecific antibody containing an anti-VEGF arm, which is the RhuFabV2 sequence with one amino acid substitution |
| RhuFabV2 | As defined in the LCAs, "the Fab anti-VEGF antibody fragment, known as RhuFabV2 or ranibizumab, that has the amino acid sequence set forth in Exhibit B." C-1, 2003 LCA § 1.95; C-2, 2019 LCA at -0147 |



4

| | |
|---|---|
| RhuFabV2 Antibody | As defined in the LCAs, "(a) RhuFabV2; and (b) other Fab anti-VEGF antibody fragments derived by or on behalf of Genentech that have one or more substitutions in the amino acid sequence of RhuFabV2 and retain the epitope binding specificity of RhuFabV2. RhuFab V2 Antibody includes, without limitation glycosylated, pegylated, or toxin-conjugated forms thereof, provided that any such RhuFabV2 Antibody retains the epitope binding specificity of RhuFabV2."<br>C-1, 2003 LCA § 1.96; C-2, 2019 LCA at -0147 |
| RVO | Retinal vein occlusion, a disorder of the eye treated by inhibiting VEGF |
| Rules | Rules of Arbitration of the International Chamber of Commerce of 2021 |
| Secretariat | Secretariat of the International Court of Arbitration |
| Toxin conjugation | The coupling of a toxin to a protein through chemical bonds or by genetically fusing the toxin to the protein |
| Tribunal | The president and the co-arbitrators, or a majority of the tribunal's members |
| USPTO | U.S. Patent and Trademark Office |
| Vabysmo® | A pharmaceutical product sold by Roche/Genentech containing the anti-VEGF/ANG-2 bispecific antibody faricimab, approved for treatment of disorders of the eye |
| VEGF or VEGF-A | Vascular Endothelial Growth Factor, a protein responsible for stimulating the formation of new blood vessels from pre-existing veins and arteries |
| VEGFR | Vascular Endothelial Growth Factor Receptor, a receptor on cells that, through the interaction with VEGF, leads to the creation of new blood vessels in the human body |
| wet AMD or nAMD | Neovascular ("wet") age-related macular degeneration, a disorder of the eye treated by inhibiting VEGF |
| Y0317 | Ranibizumab, the RhuFabV2 anti-VEGF antibody sequence as a standalone fragment, which is the active ingredient in Lucentis® |



## Table of Contents

| | | |
|---|---|---|
| I. | INTRODUCTION | 6 |
| II. | PROCEDURE | 9 |
| | A. The Parties | 9 |
| | B. The Arbitral Tribunal | 11 |
| | C. The Arbitration Agreement | 12 |
| | D. History of the Arbitral Proceedings | 14 |
| | E. The Applicable Rules of Law | 20 |
| | F. Claims and Issues for Determination | 20 |
| III. | JURISDICTION | 21 |
| | A. Claimant's Position | 21 |
| | B. Respondent's Position | 21 |
| | C. Jurisdiction Analysis and Determination | 22 |
| IV. | LIABILITY | 24 |
| | A. Legal Standards | 24 |
| | B. Claimant's Position | 25 |
| | 1. The Anti-VEGF Arm of Vabysmois a RhuFabV2 Antibody | 26 |
| | 2. Vabysmo is a Licensed Product | 30 |
| | 3. Respondent's Interpretation of the LCA is Commercially Unreasonable | 31 |
| | 4. Respondent Breached the LCA and its Covenant of Good Faith and Fair Dealing | 32 |
| | 5. Claimant's Interpretation of the LCAs Does Not Implicate European Competition Law | 32 |
| | C. Respondent's Position | 33 |
| | 1. Faricimab is not a RhuFabV2 Antibody | 33 |
| | 2. Vabysmo is Not a Licensed Product | 37 |
| | 3. Claimant's Argument about Commercial Reasonableness is Detached from Commercial Reality | 37 |
| | 4. Respondent Did not Breach the LCAs | 38 |
| | 5. Claimant's Interpretation of the LCAs Violate European Competition Law | 38 |
| | D. Liability Analysis and Determination | 38 |
| | 1. Introduction and Framework | 38 |
| | 2. The Wording of the LCAs | 39 |
| | 3. The Parties' Negotiations and Course of Performance | 49 |
| | 4. A Commercially Reasonable Interpretation | 58 |
| | 5. Conclusion | 62 |
| | 6. Outstanding Issues, and Second Phase | 62 |
| V. | COSTS | 63 |
| | A. Principle | 63 |
| | B. Analysis | 64 |
| | C. Breakdown and Interest | 67 |
| VI. | MAJORITY AND DISSENT | 68 |
| VII. | FINAL AWARD | 68 |
| VIII. | SIGNATURE | 69 |



## I.    INTRODUCTION

1.    The parties to this arbitration are two of the world's leading pharmaceutical companies. The claimant is Novartis Pharma AG ("**Novartis**") and the respondent Genentech, Inc. ("**Genentech**").

2.    This dispute arose in connection with a set of two agreements concluded between the parties: the 2003 License and Collaboration Agreement ("**2003 LCA**" or "**LCA**", or "**Agreement**") and the 2019 Amended and Restated License and Collaboration Agreement ("**2019 LCA**") (collectively, "**the LCAs**", or "**the Agreements**").[1]

3.    The 2003 LCA gave Novartis an exclusive license to develop and market "Licensed Products in the Field in the Territory".[2]  In exchange for these exclusive rights, Novartis agreed to pay Genentech ongoing royalties.

4.    The 2003 LCA defined a "Licensed Product" as "a RhuFabV2 Antibody and any formulation thereof (including, without limitation, any lyophilized solid, liquid, or sustained release formulation containing a RhFabV2 Antibody)".[3]

5.    A RhuFabV2 Antibody was in turn defined in the LCA to mean "(a) RhuFabV2; and (b) other Fab anti-VEGF antibody fragments derived by or on behalf of Genentech that have one or more substitutions in the amino acid sequence of RhuFabV2 and retain the epitope binding specificity of RhuFabV2.  RhuFabV2 Antibody includes, without limitation

---

[1] Exhibits C-1 and C-2.
[2] 2003 LCA, Art. 8.1(a).
[3] 2003 LCA, Art. 1.70.



glycosylated, pegylated, or toxin-conjugated forms thereof, provided that any such RhuFabV2 Antibody retains the epitope binding specificity of RhuFabV2".[4]

6.    The 2003 LCA also defined "RhuFabV2" as: "the Fab anti-VEGF antibody fragment, known as RhuFabV2 or ranibizumab, that has the amino acid sequence set forth in Exhibit B".[5]

7.    The "Field" was defined as "the treatment of diseases or disorders of the human eye and/or the retinal and/or the chloroidal vasculature",[6] whereas the "Territory" was defined to mean "worldwide, except North America".[7] North America was later to be reduced to the United States of America.[8]

8.    The parties' collaboration resulted in fruitful efforts to obtain regulatory approval for and to commercialize around the world the drug Lucentis®,[9] whose active ingredient is ranibizumab.[10] Since its initial launch in 2006, Lucentis® has been considered a successful product from which both parties derived significant profits.[11]

9.    In 2019, in light of the expiration of some of the Genentech's ranibizumab patents ██ ███████████████████████████████████████████████████ ▊ the parties renegotiated their License and Collaboration Agreement.[12]

10.    Among other changes, a carve-out to Novartis' exclusive rights was included in the 2019 LCA to allow Genentech to develop and commercialize the Port Delivery System

---

[4] 2003 LCA, Art. 1.96.
[5] 2003 LCA, Art. 1.95.
[6] 2003 LCA, Art. 1.42.
[7] 2003 LCA, Art. 1.106.
[8] Exhibits C-3 and C-18; Claimant's Statement of Claim on Liability, June 20, 2022, § 34.
[9] Claimant's Statement of Claim on Liability, June 20, 2022, § 44; Respondent's Statement of Defence, October 12, 2023, § 110.
[10] Claimant's Statement of Claim on Liability, June 20, 2022, § 48; Respondent's Statement of Defence, October 12, 2023, § 192.
[11] Exhibit C-24; Claimant's Statement of Claim on Liability, June 20, 2022, § 63; Respondent's Statement of Defence, October 12, 2023, § 112.
[12] Claimant's Statement of Claim on Liability, June 20, 2022, § 70; Respondent's Statement of Defence, October 12, 2023, § 112.

product in Novartis' Territory.[13] The parties also agreed that Novartis' level of efforts in marketing and selling the Licensed Product was to be reduced.[14]

11. Genentech has been a wholly owned subsidiary of the company Roche since 2009, and the two companies entered into a Major Products Agreement in 2010, which gave rights to Genentech to commercialize certain Roche products in the United States.[15]

12. On July 27, 2021, Novartis sent a letter to Respondent claiming that faricimab, the antibody contained in Vabysmo®, falls under the definition of a "*Licensed Product*" in the LCAs and that therefore, Novartis had exclusive rights to it outside the United States.[16]

13. On August 26, 2021, Genentech answered with its own letter disagreeing with Novartis' position.[17]

14. In early 2022, the drug Vabysmo® received regulatory approval and began to be commercialized around the world by Genentech and Roche.[18]  On January 28, 2022, Genentech announced that the U.S. Food and Drug Administration ("**FDA**") had approved Vabysmo® for sale in the U.S.[19]  Roche and Genentech amended their Major Products Agreement to cover Vabysmo®.[20]

15. From September 2021 to March 2022, the parties continued to exchange correspondence on the subject until, in September 2022, Novartis elected to begin these arbitral proceedings.

16. Novartis submits that Genentech breached the LCAs via its support or active participation in the development and commercialization of Vabysmo®.

17. Genentech denies Novartis' allegations and requests an award of costs.

---

[13] 2019 LCA, Art. 1, "Licensed Product".
[14] 2019 LCA, Art. 1, "Commercially Reasonable Efforts". *Compare* with 2003 LCA, Art. 1.19.
[15] Respondent's Statement of Defence, October 12, 2023, §§ 38, 45.
[16] Exhibit C-112.
[17] Exhibit C-113.
[18] *See e.g.* Exhibit C-83.
[19] Exhibit C-89.
[20] Exhibit C-91.



## II.    PROCEDURE

### A.  THE PARTIES

18.  The claimant ("**Claimant**") in this arbitration is Novartis Pharma AG, a company organized under the laws of Switzerland, with a principal place of business at this address:

> Lichtstrasse 35
> 4056 Basel
> Switzerland

19.  Claimant is represented in this matter by:

> James F. Hurst
> Donna M. Welch
> Bryan S. Hales
> Sarah K. Angelino
> KIRKLAND & ELLIS LLP
> 300 North LaSalle
> Chicago, IL 60654
> U.S.A.
> Tel.: 312-862-2000
> james.hurst@kirkland.com
> donna.welch@kirkland.com
> bryan.hales@kirkland.com
> sarah.angelino@kirkland.com
>
> Kenneth P. Monroe
> KIRKLAND & ELLIS LLP
> 200 Clarendon Street
> Boston, MA 02116
> U.S.A.
> kenneth.monroe@kirkland.com
>
> Jeffrey Alan Simes
> Alexandra D. Valenti
> GOODWIN PROCTER LLP



The New York Times Building
620 Eighth Avenue
New York, NY
U.S.A.
Telephone: +1 212 813 8800

Emily L. Rapalino
Daryl L. Wiesen
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
U.S.A.
Telephone: +1 617 570 1000

Jenny J. Zhang
Eric Levi
Kelly Grosshuesch
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
U.S.A.
Telephone: +1 202 346 4000

Email: DG-Genentech-Faricimab@goodwinlaw.com

20. The respondent ("**Respondent**") in this arbitration is Genentech, Inc., a company organized and existing under the laws of the State of Delaware, U.S.A., with its principal place of business at this address:

Genentech, Inc.
1 DNA Way
South San Francisco, CA 94080
U.S.A.

████████████████████████

21. Respondent is represented in this matter by:



David Gindler
Lauren Drake
ORRICK, HERRINGTON & SUTCLIFFE LLP
335 South Grand Avenue
Suite 2700
Los Angeles, CA 90071-1596
U.S.A.
Telephone: +1 213 629 2020
dgindler@orrick.com
ldrake@orrick.com

Hagit Muriel Elul
Michael Scerbo
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 W. 52nd Street
New York, NY 10019
U.S.A.
Telephone: +1 212 506 5000
helul@orrick.com
mscerbo@orrick.com

Nathan Shaffer
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
U.S.A.
Telephone: +1 415 773 5700
nshaffer@orrick.com

### B.  THE ARBITRAL TRIBUNAL

22.  On December 5, 2022, pursuant to Article 13(2) of the Rules, the Secretary General confirmed Robert S. Smith as co-arbitrator upon Claimant's nomination, and John Fellas as co-arbitrator upon Respondent's nomination.  The co-arbitrators' contact details are as follows:

Judge Robert S. Smith
FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP

7 Times Square
New York, NY 10036
U.S.A.
Email: rsmith@fklaw.com

Mr John Fellas
FELLAS ARBITRATION
142 Old Post Road North
Croton on Hudson,  NY 10520
U.S.A.
Email: fellas@fellasarbitration.com

23.  At its session of April 6, 2023, the Court confirmed Fabien Gélinas as president of the arbitral tribunal ("**Tribunal**", or "**Arbitral Tribunal**"), as per the parties' agreed procedure (Article 13(1)).  The president's contact details are as follows:

Prof. Fabien Gélinas, Ad. E.
McGILL UNIVERSITY FACULTY OF LAW
3644 Peel Street
Montreal (QC) H3A 1W9
Canada
Email: fabien.gelinas@outlook.com

**C.  THE ARBITRATION AGREEMENT**

24.  The agreement upon which the Request for Arbitration is based is the 2019 LCA between the parties.

25.  Section 14 of the 2019 LCA ("**Arbitration Agreement**") addresses dispute resolution as follows:



ICC Case No 27260/PDP – Final Award                                                    13



*14.2 Arbitration*







***14.3 Patent and Trademark Matters***



26.  Pursuant to the Arbitration Agreement, the language of the arbitration is English, and the place of arbitration is Washington D.C., USA.

**D.  HISTORY OF THE ARBITRAL PROCEEDINGS**

27.  On September 16, 2022, the Secretariat received the Request for Arbitration from Claimant and, on September 19, 2022, acknowledged receipt thereof.[21]

28.  The Secretariat notified the Request for Arbitration to Respondent on September 21, 2022.

---

[21] Request for Arbitration, September 16, 2022.

29. On October 11, 2022, the time limit for filing the Answer to the Request for Arbitration was extended to November 22, 2022.

30. On October 13, 2022, the parties agreed to a selection procedure for the constitution of the Tribunal.[22] The selection procedure was as follows:

*1. The parties shall each nominate a co-arbitrator for confirmation by the ICC Court in accordance with the following procedure:*

*(a) Novartis Pharma AG ("Novartis") shall nominate a co-arbitrator within 20 days of the parties agreeing on the appointment procedure for the arbitral tribunal; and*

*(b) Genentech, Inc. ("Genentech") shall nominate a co-arbitrator within 20 days of Novartis nominating a co-arbitrator.*

*2. The parties, in consultation with the two co-arbitrators, shall seek to agree on the choice of the third arbitrator, who shall serve as the president of the arbitral tribunal on confirmation by the ICC Court, in accordance with the following procedure:*

*(a) the parties shall seek to agree on the choice of the president of the arbitral tribunal for a period of 20 days running from Genentech's nomination of a co-arbitrator (subject to any extension of this 20-day period that may be agreed by the parties);*

*(b) each party may communicate with its nominated co-arbitrator for the purpose of seeking to agree on the choice of the president of the arbitral tribunal;*

*(c) the two co-arbitrators shall jointly contact candidates for appointment as president of the arbitral tribunal for the purposes of checking availability and conflicts of interest, and there shall be no other contact with such candidates for any purpose whatsoever relating to this arbitration unless and until the ICC Court has appointed that person as the president of the arbitral tribunal; and*

*(d) any candidate proposed during discussions seeking to agree on the choice of president of the arbitral tribunal shall not be disqualified from subsequent appointment by the ICC Court solely on the ground that such candidate was proposed and not accepted during those discussions.*

*3. If the parties fail to agree on the choice of the president of the arbitral tribunal within the time limit under step 2(a), the ICC Court shall appoint the president of the arbitral tribunal in accordance with the following procedure:*

*(a) the ICC Court shall communicate to the parties a list of seven (7) candidates for appointment as president of the arbitral tribunal, each of whom must have legal experience in pharmaceutical disputes and be free of conflicts of interest;*

---

[22] Claimant's correspondence to the Secretariat dated October 13, 2022.



*(b) each party may strike up to two (2) names from that list and must rank the remaining names on that list in order of preference (with one being the most preferred candidate), and shall communicate its strike-and-rank selection to the ICC Court and other party within 10 days of receiving the list from the ICC Court;*

*(c) the ICC Court shall thereafter notify the parties of the highest-ranked candidate (i.e., the candidate with the lowest aggregate total who has not been struck by either party) and that person shall be appointed as the president of the arbitral tribunal;*

*(d) at any stage of this list procedure, each party may communicate with its nominated co-arbitrator regarding the candidates for appointment as president of the arbitral tribunal; and*

*(e) no party or co-arbitrator shall contact any candidate for any purpose whatsoever relating to this arbitration unless and until the ICC Court has appointed that person as the president of the arbitral tribunal through this list procedure.*

31. Pursuant to the agreed procedure, on October 21, 2022, Claimant designated Robert S. Smith as co-arbitrator.[23]  In accordance with the same procedure, on November 10, 2022, Respondent designated John Fellas as co-arbitrator.[24]

32. On November 22, 2022, Respondent filed its Answer to the Request for Arbitration.[25]

33. On December 5, 2022, pursuant to Article 13(2) of the Rules, the Secretary General confirmed the co-arbitrators.

34. On January 23, 2023, the parties requested that the Secretariat prepare a list of candidates for president of the Tribunal, pursuant to the parties' agreed procedure.

35. On March 13, 2023, the Secretariat communicated a list of candidates for president of the Tribunal to the parties for their striking and ranking of the candidates pursuant to the parties' agreed procedure.

36. On March 27, 2023, the parties provided their strikes and ranks to the Secretariat, pursuant to the parties' agreed procedure.

---

[23] Claimant's Letter to the Secretariat dated October 21, 2022.
[24] Respondent's Letter to the Secretariat dated November 10, 2022.
[25] Answer to the Request for Arbitration, November 22, 2022.



37. On April 6, 2023, the Court confirmed Fabien Gélinas as president of the Tribunal in accordance with the parties' agreed procedure under Article 13(1) of the Rules. The Court's decision was notified to the president, the co-arbitrators and the parties on the same day.

38. Pursuant to Article 16 of the Rules, the file was transmitted to the Tribunal on April 6, 2023.

39. On May 1, 2023, the Tribunal and the parties executed the Terms of Reference pursuant to Article 23 of the Rules.

40. In the Terms of Reference, the parties agreed the following terms in respect of the time limits set out in the arbitration agreement:

> *32. By signing these Terms of Reference, each Party recognizes and agrees that the time limits set forth in the Arbitration Agreement do not have any effect on the power of the Court to extend time limits under Article 39(2) of the Rules where necessary. Each Party also accepts that the obligation imposed on arbitrators to "issue" their decision within a certain time limit refers to the submission of said decision, in draft form, to the Court for scrutiny under Article 34 of the Rules. Each of the Parties further agrees that all time limits found in the Arbitration Agreement are imposed on a "commercially reasonable efforts" basis, and that the mere fact of a failure to meet said time limits shall not affect the validity of the arbitral procedure or enforceability of any resulting award.*

41. On May 6, 2023, a case management conference was held remotely. The parties agreed, *inter alia*, on the adoption of confidentiality protections.

42. The parties also agreed on the bifurcation of the proceedings, with liability to be addressed in a first phase and, depending on the result of the first phase, remedies in a second phase. On that basis, the Tribunal circulated a draft procedural timetable and draft initial procedural directions.

43. Following the case management conference, the Tribunal issued Procedural Order No. 1 (Stipulated Order on Confidentiality) on May 9, 2023.[26]

---

[26] Procedural Order No 1 (Stipulated Order on Confidentiality), 9 May 2023.

44. On June 2, 2023, the Tribunal issued Procedural Order No. 2 (Initial Procedural Directions).[27]

45. On the same day, together with Procedural Order No. 2, the Tribunal issued, in accordance with Article 24(2) of the Rules, the Procedural Timetable.[28]

46. Between May 11, 2023, and June 15, 2023, the parties conducted an accelerated document exchange process for the liability phase of the arbitration.

47. On June 20, 2023, Claimant filed its Statement of Claim on Liability.[29]

48. On July 31, 2023, the Tribunal issued an amended Procedural Timetable.

49. On August 10, 2023, the Tribunal issued an amended Procedural Order No 1 – Stipulated Order on Confidentiality.

50. On October 12, 2023, Respondent filed its Statement of Defence on Liability.[30]

51. On December 14, 2023, Claimant filed its Reply on Liability.[31]

52. On February 8, 2024, Respondent filed its Rejoinder on Liability.[32]

53. A hearing was held in New York City from March 11, 2024 to March 14, 2024 during which the parties presented opening arguments and fact and expert witnesses were heard. ███████████████████████ (expert), █████████████████████ ████ ██████████████████████████████████████████████ (expert) testified at the behest of Claimant; and ████████████████ ████████████████ (expert), ████████████████████████████████ █████ (expert), and ██████████████████████ (expert) testified at the behest of Respondent.

---

[27] Procedural Order No 2 (Initial Procedural Directions), June 2, 2023.
[28] Procedural Timetable, June 2, 2023.
[29] Claimant's Statement of Claim on Liability, June 20, 2023.
[30] Respondent's Statement of Defence on Liability, November 12, 2023.
[31] Claimant's Reply to Statement of Defence, December 14, 2023.
[32] Respondent's Rejoinder, February 8, 2024.

54. At the end of the hearing, a case management discussion took place to plan the next steps, namely, the filing of two rounds of simultaneous post-hearing submissions, and arrangements for in-person closing arguments.

55. During the case-management discussion, the parties put on the record that they had agreed to waive the contractual time-limit for rendering the award.[33]

56. On May 29, 2024, the parties submitted their Post-Hearing Briefs.[34]

57. On July 19th, 2024, the parties submitted their Post-Hearing Reply Briefs.[35]

58. A further hearing was held in New York City on September 3, 2024, during which the parties presented their closing arguments.

59. On June 8, 2023 and September 5, 2024, pursuant to Article 31(2) of the Rules, the Court extended the time limit for rendering the final award to September 30, 2024, and to March 31, 2025 respectively.

60. On July 19, 2024, the parties agreed and forwarded the final transcript with errata for the March hearing.

61. On October 24, 2024, the parties filed their simultaneous costs submissions for the first phase, followed by their reply costs submissions on November 7, 2024.

62. On December 12, 2024, the Tribunal declared the proceedings closed in respect of the matters to be decided in this award and gave an indication of the date when a draft award would be submitted to the Court for scrutiny.

63. The Tribunal submitted a draft award to the scrutiny of the ICC Court on December 31, 2024. On January 30, 2025, pursuant to Article 34 of the Rules, the ICC Court approved the draft award and, pursuant to Article 38 of the Rules, fixed the costs of the arbitration. Notification of the ICC Court's decision was sent on February 3, 2025.

---

[33] Hearing Transcript, Vol. 4, 1571—1574.

[34] Claimant's Post-Hearing Brief, May 29, 2024; Respondent's Opening Post-Hearing Brief, May 29, 2024.

[35] Claimant's Response to Respondent's Post-Hearing Brief, July 19, 2024; Respondent's Post-Hearing Reply Brief, July 19, 2024.

64. On February 4 and 5, 2025, the Parties requested that the proceedings be held in abeyance for the purpose of settlement discussions until March 5, 2025. On March 4, 2025, the Parties requested that the proceedings be held in abeyance until April 11, 2025. On April 9, 2025, Respondent informed the Tribunal and the Secretariat that the Parties had been unable to reach a settlement, and requested that the stay be lifted and the award be issued. On April 11, 2025, Claimant confirmed Respondent's statement and joined in the request that the award be issued.

## E. THE APPLICABLE RULES OF LAW

65. Article 17.1 of the Arbitration Agreement provides that "This agreement shall be governed by and construed in accordance with laws of the State of New York without giving effect to the principles of conflict of laws thereunder (other than Section 5-1401 of the General Obligations Law)". The governing substantive rules of law are accordingly those applicable in the State of New York.

## F. CLAIMS AND ISSUES FOR DETERMINATION

66. Based on the parties' most recent submissions, the following issues are before this Tribunal for determination in the liability phase of this arbitration:[36]

> 1. Does the Tribunal have jurisdiction to issue a declaration concerning a product owned by third party Roche, Genentech's parent company?
>
> 2. Is Vabysmo®, faricimab, or the VEGF-binding arm of faricimab, a Licensed Product under the LCAs?
>
> 3. Did Respondent breach the LCAs as contended by Claimant?
>
> 4. In the event the Tribunal issues a final award, how should the costs of the arbitration be allocated?

---

[36] The relief sought by Novartis originally included an award of specific performance "*by Genentech under the LCA requiring Genentech to enable Novartis to Market Vabysmo® in its territory*" (Request for Arbitration, § 59). This prayer for relief was dropped in the Statement of Claim (§ 208). Novartis also extended, *in effect*, the scope of the declaration it originally sought to include "licenced products" "contained in" Vabysmo® (faricimab and the VEGF-binding arm of faricimab: Statement of Claim, § 202; Claimant's Post-Hearing Brief, § 190).

67.  The Tribunal begins with a consideration of its jurisdiction in this case (III), before turning its attention to the issue of liability (IV).

## III.    JURISDICTION

68.  Arguments were presented by the parties concerning the jurisdiction of this Tribunal to hear their dispute.

### A.  CLAIMANT'S POSITION

69.  Claimant contends that the LCAs give this Tribunal plenary jurisdiction to hear this dispute.[37]

70.  Claimant insists that it "seeks no relief as to [Respondent's] parent company Roche" and that this Tribunal does not need to decide anything about Roche in order to find Respondent in breach of its obligations under the LCAs.[38]

71.  Furthermore, Claimant argues that by submitting its arguments on the merits to this Tribunal, Respondent has conceded to its jurisdiction.[39]

### B.  RESPONDENT'S POSITION

72.  Respondent argues that this Tribunal does not have jurisdiction to declare Vabysmo® to be a Licensed Product under the LCAs.[40]

73.  According to Respondent, what Claimant seeks to obtain in this arbitration are the exclusive rights to commercialize Vabysmo® outside the United States.  Respondent insists that these rights rest solely with Roche, its parent company.  The declaration Claimant requests would therefore "impinge on Roche's property interests in Vabysmo®".[41]

---

[37] 2003 LCA, Art. 1.34, 15.2; 2019 LCA, Art. 14.2; Claimant's Reply to Statement of Defence, December 14, 2023, §§ 92, 94.
[38] Claimant's Reply to Statement of Defence, December 14, 2023, § 91; Claimant's Post-Hearing Brief, May 29, 2024, §§ 188—189.
[39] *Teamsters Loc. Union No. 533 v. Herbert Fuel Oil & Trucking Co.*, 543 F. Supp. 831, 834 (E.D.N.Y. 1982); *Odyssey Reins. Corp. v. Ace Prop. & Cas. Ins. Co.*, 2006 N.Y. Misc. LEXIS 2439, at *10 (Sup. Ct. Aug. 7, 2006); Claimant's Reply to Statement of Defence, December 14, 2023, § 91.
[40] Respondent's Statement of Defence, November 12, 2023, § 177.
[41] Respondent's Statement of Defence, November 12, 2023, §§ 179—180.



74. Respondent contests Claimant's assertion that it "seeks no relief as to [Respondent's] parent company Roche".[42] Respondent asserts that Claimant is seeking declaratory relief from the Tribunal as a basis to later obtain specific performance requiring Respondent to enable Claimant to market Vabysmo® in its territory.[43] Such an award would have "the potential to nullify Roche's ownership interests in Vabysmo® and the intellectual property that protects it", despite Roche not being a party to this proceedings.[44]

75. Respondent points out that this Tribunal "has exclusive authority to adjudicate disputed rights under the LCAs solely between [Claimant] and [Respondent]".[45] Roche, however, is not a party to the LCAs. Therefore, Respondent concludes, this Tribunal does not have jurisdiction to "adjudicate property rights that belong to Roche, which is neither a party to the LCA nor to this proceeding" and Claimant's claim must therefore fail as a threshold matter.[46]

## C. Jurisdiction Analysis and Determination

76. We do not consider that the arguments presented under this heading are properly characterized as going to jurisdiction. The arguments, rather, appear to be directed at either the remedial powers of this Tribunal or the legal effect of its decisions on third parties. It is undeniable, on one hand, that we have the power to issue a declaration of rights under the contract as between the parties, and, on the other hand, that we have no power over the legal effect that other adjudicative bodies may give to our award.

77. It is understood that Roche is not a party to this arbitration or to the contract. We are adjudicating the rights of the parties to the contract as between the parties to this arbitration. In both cases the parties are Novartis and Genentech. Any potential impact on Roche's ownership interest in Vabysmo® or the intellectual property that protects it would be an indirect consequence of the parties' legitimate exercise of the right to seek

---

[42] Respondent's Rejoinder, February 8, 2024, § 16; Claimant's Reply to Statement of Defence, December 14, 2023, § 91.
[43] Respondent's Rejoinder, February 8, 2024, § 16; Claimant's Request for Arbitration, September 16, 2022, § 59.
[44] Respondent's Rejoinder, February 8, 2024, § 17.
[45] 2003 LCA, § 15.2; 2019 LCA, Art. 14.2; Respondent's Statement of Defence, November 12, 2023, § 181; Respondent's Rejoinder, February 8, 2024, § 17.
[46] Respondent's Statement of Defence, November 12, 2023, § 181.

recourse in arbitration for a purported breach of the contract between them. Respondent's suggestion that Claimant is seeking declaratory relief as a basis to later obtain specific performance requiring Respondent to enable Claimant to market Vabysmo® in its territory is speculation.

78.   Novartis seeks a declaration that (because Vabysmo®, faricimab, or the VEGF-binding arm of Faricimab is a Licensed Product under the LCAs) Genentech has breached the contract "by encroaching on Novartis' exclusive Territory, including by seeking and supporting regulatory approval of, using, selling, importing, and/or promoting Vabysmo® in countries outside the United States".[47]   Section 14.2(e) of the Arbitration Agreement provides:



79.   Since a determination of breach requires a determination as to whether Vabysmo® is or contains a Licenced Product under the contract, it is clear to us that Claimant asks no more in these proceedings than what is contemplated in the Arbitration Agreement. Novartis does not seek relief from this Tribunal with respect to Roche: we can only decide the dispute before us, between the parties, and it is our duty to do so.

80.   On that basis, the Tribunal is satisfied that it has jurisdiction to hear and to decide the dispute.

---

[47] Statement of Claim, § 208.

## IV.    LIABILITY

### A.    LEGAL STANDARDS

81.    The parties agree that the LCAs are governed by New York law.[48]  They also agree on the four elements required for a breach of contract claim under New York law: (i) formation/existence of a contract between the parties; (ii) performance by the plaintiff in accordance with the contract; (iii) defendant's breach or failure to perform its contractual obligations; and (iv) resulting damages.[49] The first two elements are not contested in these proceedings, and the fourth element is reserved, as required, to a second phase of this arbitration.  The third element is the one at issue in these proceedings.

82.    The parties are also in agreement on the principle that contracts governed by New York law are to be "construed in accordance with the intent of the parties", the best evidence of which being what they put down in writing.[50]  They also agree that when interpreting a contract, "particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby",[51] as well as on the idea that the interpretation should not produce an absurd result, one that is commercially unreasonable or contrary to the intent and the reasonable expectations of the parties.[52]

83.    Claimant further states that "when interpreting a contract, if the contract terms are unambiguous, the terms must be applied as written and there is no role for extrinsic

---

[48] 2003 LCA, § 18.1; 2019 LCA, Art. 17.1; Claimant's Statement of Claim, June 20, 2023, § 118; Respondent's Statement of Defence, November 12, 2023, § 170.

[49] Claimant's Statement of Claim, June 20, 2023, § 119; Respondent's Statement of Defence, November 12, 2023, § 170. Claimant relies on *PNC Bank, Nat'l Ass'n v. Wolters Kluwers Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 367 (S.D.N.Y. 2014), and Respondent on *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

[50] Claimant's Statement of Claim, June 20, 2023, § 120; Respondent's Statement of Defence, November 12, 2023, § 171. Claimant relies on *Goldman v. White Plains Center for Nursing*, 867 N.Y.S.2d 27 (2008); Respondent on *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002) and *Elm Lansing Realty Corp. v. Knapp*, 192 A.D.3d 1348, 1351 (3d Dep't 2021).

[51] Claimant's Statement of Claim, June 20, 2023, § 120; Respondent's Statement of Defence, November 12, 2023, § 172. Claimant relies on *Givati v. Air Techniques, Inc.*, 646, 960 N.Y.S.2d 196, 198 (2d Dep't 2013); Respondent relies on *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).

[52] Claimant's Statement of Claim, June 20, 2023, § 120; Respondent's Statement of Defence, November 12, 2023, § 172. For the Claimant, reference is made to *Matter of Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003); for the Respondent, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (1st Dep't 2015).

evidence".[53]  It also highlights the existence, implicit in all contracts under New York law, of a covenant of good faith and fair dealing in the course of contract performance.[54]

84. Respondent adds that interpretation of a contract, "particularly one with technical or industry-specific terminology", should be conducted from the position of a "reasonably intelligent person who has examined the context of the entire agreement and is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business".[55] Furthermore, the parties' course of performance and their interpretation of the contract in practice must be considered.[56]

## B. CLAIMANT'S POSITION

85. Claimant contends that Vabysmo® is a Licensed Product under the LCAs, and that by developing, obtaining regulatory approval for, and marketing Vabysmo® in Claimant's Territory, Respondent has breached its obligations under the LCAs.

86. Claimant points to various definitions contained in the 2019 LCA, including:



[53] Claimant's Statement of Claim, June 20, 2023, § 121; Claimant's Post-Hearing Brief, May 29, 2024, § 87. Claimant's authorities are *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002); *S. Rd. Assocs., LLC v. IMB*, 4 N.Y.3d 272, 278 (2008) and *B.D. v. E.D.*, 218 A.D.3d 9, 18 (1st Dep't 2023).
[54] Claimant's Statement of Claim, June 20, 2023, § 122. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) and *Richbell Info. Servs., Inc. v. Jupiter Partners. L.P.*, 76 N.Y.S.2d 575, 567 (1st Dep't 2003).
[55] Respondent's Statement of Defence, November 12, 2023, § 173. Respondent *cites L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).
[56] Respondent's Statement of Defence, November 12, 2023, § 174. Respondent relies on *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d 632, 640–41 (S.D.N.Y. 1999) and *Genovese v. Axel*, 40 A.D.3d 693, 694.



██████████████████████████████

87.   According to Claimant, the product Vabysmo® is a Licensed Product because its active ingredient, faricimab, is an antibody which has for one of its "arms" a RhuFabV2 Antibody as defined in the LCA.

### 1.   The Anti-VEGF Arm of Vabysmo is a RhuFabV2 Antibody

88.   Claimant argues that faricimab's anti-VEGF arm is a RhuFabV2 Antibody because it meets each part of the definition of a RhuFabV2 Antibody at Section 1.96 (b).

#### a.   Faricimab's Anti-VEGF Arm is a "Fab Anti-VEGF Antibody Fragment"

89.   First, section 1.96 (b) defines a RhuFabV2 Antibody as "other Fab anti-VEGF antibody fragments".  Claimant asserts that the term "fragment" as used in the definition refers both to an isolated antibody fragment – such as ranibizumab – and to a region of a full-length antibody – such as the anti-VEGF arm of faricimab.  It insists that the evidence from the scientific literature as well as from the witnesses heard at the hearing should lead the Tribunal to this conclusion.

90.   Claimant explains that one of the arms of faricimab "essentially is ranibizumab, which binds to VEGF" and that its sequence is identical to the one of ranibizumab, the active ingredient in Lucentis®, but for one amino acid substitution that is not on the binding portion of the sequence and which has no therapeutic impact.[58]

91.   Respondent's position that a fragment is by definition "not part of something else" is "unsupportable", states Claimant, relying on the meaning of the word in plain English, which defines it as a piece or a part of a whole.[59]

---

[57] 2019 LCA, Art. 1 "Licensed Product", "RhuFabV2 Antibody", "RhuFabV2"; Claimant's Statement of Claim, June 20, 2023, §129.
[58] Claimant's Statement of Claim, June 20, 2023, §§ 134—135.
[59] Claimant's Post-Hearing Brief, May 29, 2024, §§ 64—65; Respondent's Rejoinder, 8 February 2024, §§ 34, 36. Claimant relies on definitions contained in the Oxford English Dictionary (cited by Respondent), the Collins English Dictionary and the Cambridge Dictionary.



92.    Claimant also states that the anti-ANG-2 arm that Respondent has added to ranibizumab to make faricimab has no demonstrated therapeutical added value,[60] and that even if it did, it is legally immaterial.[61]

93.    It contests the Respondent's argument that adding components to RhuFabV2 or to its amino acid sequence takes it out of the RhuFabV2 Antibody definition,[62] observing that it would be an absurd reading of the contract.[63]

94.    Claimant also notes that the parties could have excluded full-length antibodies from the definitions but chose not to, and that the Tribunal may not read in additional terms which the parties failed to insert.[64]

b.    Faricimab's Anti-VEGF Arm was "Derived by or on Behalf" of Respondent

95.    Secondly, Section 1.96 (b) holds that the Fab anti-VEGF antibody fragment must have been "derived by or on behalf of Genentech".

96.    According to Claimant, Respondent invented the ranibizumab and initially introduced the single amino acid difference that separates ranibizumab and the anti-VEGF arm of faricimab.  Therefore, there can be no dispute that faricimab's anti-VEGF arm was derived by Respondent.[65]

97.    This single amino acid difference should not take faricimab's anti-VEGF arm out of the equation, as Section 1.96 (b) comprises Fab anti-VEGF antibody fragments that have "one or more substitutions in the amino acid sequence of RhuFabV2".[66]

98.    It would be superfluous to go any further, as the fact that it is Roche that allegedly derived Vabysmo® is irrelevant; what matters is the fact that Respondent derived faricimab's

[60] Claimant's Statement of Claim, June 20, 2023, §§ 156, 160. Claimant's Reply to Statement of Defence, December 14, 2023, §§ 33—38; Claimant's Post-Hearing Brief, §§ 135—142.
[61] Claimant's Post-Hearing Brief, May 29, 2024, § 135.
[62] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 19—20.
[63] Claimant's Post-Hearing Brief, May 29, 2024, §§ 13, 101.
[64] Claimant's Post-Hearing Brief, May 29, 2024, § 86. Claimant relies on *Yang v. Northwell Health, Inc.*, 195 A.D.3d 662, 665 (2d Dep't 2021).
[65] Claimant's Post-Hearing Brief, May 29, 2024, §14.
[66] Claimant's Post-Hearing Brief, May 29, 2024, §98.



anti-VEGF arm, which is a RhuFabV2 Antibody.  However, Claimant contends that faricimab itself was also derived <u>on behalf of</u> Respondent by its parent company, Roche.

99.  Claimant rejects Respondent's argument that "on behalf of" connotes a formal agency relationship.  Because there is no applicable statute governing the construction of the phrase, Claimant argues that it is the plain English meaning that controls, which it holds to be "as a representative of someone" or "for the benefit of someone" or "in the support of someone".[67]

100.  Notwithstanding the applicable definition, Claimant insists that faricimab was developed on behalf of Genentech;[68] and that in any case, what the LCA requires is that the RhuFabV2 Antibody has been derived "by **or** on behalf of" Respondent.[69]

101.  According to Claimant, the ranibizumab "portion" of faricimab was derived by Genentech, and the non-ranibizumab portion of it was also derived "by or on behalf of" Genentech.[70] This allegedly stems from Genentech and Roche functioning as a "highly coordinated unit", with integrated management and development teams, including on the development of faricimab.  According to Claimant, Genentech's employees were involved in each phase of faricimab's clinical trials.  They routinely switch back and forth between positions at each of the companies and collaborate, discuss and share experience.  It rejects the assertion that a "firewall" is in place and that the two entities functioned as separate entities, at arm's length with respect to the development of faricimab.[71]

c.  <u>Faricimab's Anti-VEG Arm "Retains the Epitope Binding Specificity of RhuFaBV2"</u>

102.  Section 1.96 (b) also requires that the fragment retain "the epitope binding specificity of RhuFabV2".

---

[67] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 52—53. Claimant relies on *Kannuu Pty Ltd. v. Samsung Elecs. Co.*, 2021 WL 195163, at *3 (S.D.N.Y. Jan. 19, 2021).
[68] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 54—56.
[69] Claimant's Post-Hearing Brief, May 29, 2024, § 103 (emphasis added by Claimant).
[70] Claimant's Reply to Statement of Defence, December 14, 2023, § 51.
[71] Claimant's Post-Hearing Brief, May 29, 2024, §§ 104—109.



103. Claimant states that "because the functional portion of the anti-VEGF arm is identical to that of ranibizumab, the anti-VEGF Fab arm of faricimab also retains the same epitope binding specificity – or binds to the same amino acids of VEGF – as RhuFabV2".[72]

104. Although there may be elements added to RhuFabV2 that bind to things other than VEGF, faricimab's anti-VEGF arm retains the epitope binding specificity for VEGF and therefore, Claimant continues, it fits the definition contained in the LCA.[73]

d.   Respondent's "Course of Conduct" Argument and Extrinsic Evidence Should Be Dismissed

105. Claimant resists Respondent's arguments relative to the parties' course of conduct based on the parol evidence rule under New York law, which "precludes evidence of a prior or contemporaneous communication during negotiations of an agreement that contradicts, varies or explains a written agreement" and states that extrinsic evidence can only be used in the face of an ambiguous term.[74]

106. 

---

[72] Claimant's Statement of Claim, June 20, 2023, §§ 136—137; Claimant's Reply to Statement of Defence, December 14, 2023, §§ 39—43.

[73] Claimant's Post-Hearing Brief, May 29, 2024, § 112.

[74] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 66, 73. Claimant relies at § 66 on *Hoeg Corp. v. Peebles Corp.*, 153 A.D.3d 607, 608, 60 N.Y.S.3d 259, 261 (2d Dep't 2017); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163, 566 N.E.2d 639, 642 (1990) and *B.D. v. E.D.*, 218 A.D.3d 9, 18, 194 N.Y.S.3d 8, 16 (1st Dep't 2023); it relies at § 73 on *Spicer v. GardaWorld Consulting (UK) Ltd.*, 181 A.D.3d 413, 415, 120 N.Y.S.3d 34, 37 (1st Dep't 2020) *and Ex rel. Hatch v. Nyco Minerals, Inc.*, 245 A.D.2d 746, 749, 666 N.Y.S.2d 296, 299 (3d Dep't 1997)

[75] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 73—77; Claimant's Post-Hearing Brief, May 29, 2024, §§ 94—95.

107. In the same order of ideas, Claimant strongly disagrees with Respondent's claim that Novartis knew about faricimab during the negotiations leading to the 2019 LCA and did not raise the matter back then, arguing that it is legally improper speculation.[76]

108. Finally, ███████████████████████████████████████████████████ ███████████████████████████████ ████████████. Contract liability is strict liability, it asserts, and whatever Claimant's subjective intentions may be is entirely irrelevant to the determination of whether a breach occurred.[77] In light of the applicable statute of limitations and of the LCA's "no waiver" provision, neither the timing of the claim nor Claimant's subjective intent are relevant to the issues presented to this Tribunal.[78]

## 2. Vabysmo® is a Licensed Product

109. Claimant's position centres on the claim that Vabysmo® is a Licensed Product within the definition of the LCAs.

110. Claimant contends that if it prevails on its argument that faricimab's anti-VEGF arm is a RhuFabV2 Antibody, then it stands to reason that faricimab falls into the definition of a Licensed Product. As a formulation, then, Vabysmo® is also a Licensed Product under section 1.70, which states: "'Licensed Product' means RhuFabV2 Antibody and any formulation thereof (including, without limitation, any lyophilized solid, liquid, or sustained release formulation containing a RhuFabV2 Antibody)".[79]

111. According to Claimant, it is undisputable that Vabysmo® fits the plain language of the definition, and that it is a "formulation" of faricimab, which contains the RhuFabV2 Antibody exclusively licensed to it as its anti-VEGF arm.[80]

[76] Claimant's Post-Hearing Brief, May 29, 2024, §§ 151—155. Claimant cites *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 338 (N.D.N.Y. 2017) and *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999).
[77] Claimant's Reply to Statement of Defence, December 14, 2023, § 84.
[78] Claimant's Reply to Statement of Defence, December 14, 2023, § 87. Claimant cites *McCormick v. Favreau*, 82 A.D.3d 1537, 1540, 919 N.Y.S.2d 572, 576 (3d Dep't 2011) and *Equator Int'l, Inc. v. NH St. Invs., Inc.*, 43 Misc. 3d 251, 260-61, 978 N.Y.S. 2d 817, 824-25 (Sup. Ct. 2014). Claimant's Post-Hearing Brief, May 29, 2024, §§ 156—158.
[79] 2019 LCA, Art. 1, "Licensed Product"; Claimant's Statement of Claim, June 20, 2023, § 142.
[80] Claimant's Post-Hearing Brief, May 29, 2024, §§ 119.



112. Claimant relies on a definition in plain English of "formulation" as "a material or mixture prepared according to a formula", as well as an industry-specific definition of "formulation" as "a final pharmaceutical product in a form to be administered to a patient".[81]  It also contends that both the FDA and Respondent itself have identified Vabysmo® as a "formulation" and as a "pharmaceutical composition containing faricimab".[82]

113. Claimant also counters Respondent's argument that Vabysmo® is not a Licensed Product because its only "active ingredient" is faricimab, arguing that it is not supported by the language of the LCA.

### 3.  Respondent's Interpretation of the LCA is Commercially Unreasonable

114. Claimant highlights that under New York law, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties".[83]

115. Claimant affirms that accepting some of Respondent's arguments as to how the contract should be interpreted would lead to commercially absurd results, because Respondent would then be able to escape its obligations by, among other things: placing a fragment that does nothing into a full-length antibody; add or substitute inconsequential amino acids; or have its parent company Roche do these things and then profit as a result.[84]

116. Therefore, Claimant concludes, Respondent's interpretation is disfavored under New York law.[85]

---

[81] Claimant's Statement of Claim, June 20, 2023, §§ 141, 143.
[82] Claimant's Statement of Claim, June 20, 2023, §§ 145—146.
[83] Claimant's Post-Hearing Brief, May 29, 2024, §§ 133—134. Claimant relies on *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) and *HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 826 N.Y.S.2d 190, 196 (1st Dep't 2006).
[84] Claimant's Statement of Claim, June 20, 2023, § 156; Claimant's Reply to Statement of Defence, December 14, 2023, § 20; *ibid*.
[85] Claimant's Statement of Claim, June 20, 2023, § 157. *See Jones v. Mercedes-Benz, Manhattan, Inc.*, 1:19-cv-00472, 2020 WL 1445728, at *6 (S.D.N.Y. March 25, 2020); *Yafa Jewelry Inc. v. All Those Underwriters Subscribing to Policy of Ins. Numbered 96FA0026180A*, 42 F.Supp. 2d 307, 311 (S.D.N.Y. 1999). Claimant's Post-Hearing Brief, May 29, 2024, §12.

#### 4.   Respondent Breached the LCA and its Covenant of Good Faith and Fair Dealing

117. Finally, Claimant argues that it necessarily follows from a finding that Vabysmo® is a Licensed Product that Respondent breached a number of its obligations under the LCAs, including, among other things, by violating Claimant's exclusive license to "use, sell, offer for sale and import … Licensed Products in the Field in the Territory".[86]

118. Claimant also contends that Respondent breached the covenant of good faith and fair dealing implied in the Agreement pursuant to New York law by engaging in "gamesmanship" designed to deprive Claimant from the right to receive the fruits of the contract, in collusion with its parent company.[87]

119. Claimant accuses Respondent of trying to escape liability by "hiding behind Roche", its parent company, and insists it is not seeking any relief with respect to Roche.[88]

120. Claimant alleges that it has suffered damages due to Respondent's conduct and breaches – ███████████████████████████ – and that these damages should be determined in the next phase of the arbitration.[89]



[86] Claimant's Statement of Claim, June 20, 2023, § 175; Claimant's Reply to Statement of Defence, December 14, 2023, § 107; Claimant's Post-Hearing Brief, May 29, 2024, §§ 159—179.
[87] Claimant's Statement of Claim, June 20, 2023, § 201; Claimant's Post-Hearing Brief, May 29, 2024, §§ 180—186. Claimant relies, among others, on *Dalton v. Educ. Testing Serv.*, 63 N.E.2d 289 (1995).
[88] Claimant's Statement of Claim, June 20, 2023, § 195; Claimant's Post-Hearing Brief, May 29, 2024, § 188. Claimant relies on *Standard Chartered Bank v. AWB (USA) LTD.*, C.A. No. 05-civ-2013, 2010 WL 532515, at *14 (S.D.N.Y. Feb. 16, 2010).
[89] Claimant's Post-Hearing Brief, May 29, 2024, § 187.
[90] Claimant's Reply to Statement of Defence, December 14, 2023, § 97.
[91] Claimant's Response to Respondent's Post-Hearing Brief, 19 Jul 2024, § 96, at fn 14.

122. ███████████████████████████████████████████████████████
████████████████████████████████████

## C. RESPONDENT'S POSITION

123. Respondent asks the Tribunal to reject all of Claimant's claims, because, *inter alia*, Vabysmo® is not a Licensed Product under the LCAs and thus Respondent did not breach any of its obligations under the Agreements.

124. Respondent asserts, as a threshold matter, that Claimant is seeking rights to a product created and patented by Roche, which is a third party to the LCAs and has no obligations under them.[93]

125. Respondent insists that Roche and Genentech are, in law and in fact, separate entities, noting that under New York law "corporates affiliates are treated as distinct corporate entities in the absence of some legal basis to make one entity vicariously liable for the actions of another".[94]  Claimant has not demonstrated one of the two circumstances necessary for a parent corporation to be held liable for the contract of its subsidiary.[95]

### 1. Faricimab is not a RhuFabV2 Antibody

126. Respondent contends that faricimab, the active ingredient in Vabysmo®, is not a RhuFabV2 Antibody under the LCAs.

#### a. The RhuFabV2 Definition only Covers an Antibody Fragment and not a Region of a Full-Length Antibody

127. Respondent argues that the definition of "RhuFabV2 Antibody" in the LCAs "is clear and unequivocal", and that faricimab falls outside of it.[96]  More particularly, faricimab is not a "Fab anti-VEGF antibody fragment" because unlike ranibizumab, it is a "full-

---

[92] *Ibid.*
[93] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 11—13.
[94] Respondent's Statement of Defence, § 291; Respondent cites *Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980).
[95] Respondent's Opening Post-Hearing Brief, May 29, 2024, § 12. Respondent cites *World Wide Packaging, LLC v. Cargo Cosms.*, 193 A.D.3d 442 (1st Dep't 2021).
[96] Respondent's Statement of Defence, October 12, 2023, § 183.

length bispecific antibody".[97] Faricimab itself does not satisfy the definitions contained at section 1.96 (a) and (b), which are limited to "isolated" antibody fragments.[98]

128. According to Respondent, the phrase "Fab anti-body VEGF fragment" must have the same meaning in section (a) and (b).  In section (a), the phrase indisputably refers to the isolated fragment ranibizumab; therefore, section (b) cannot refer to a full-length bispecific antibody such as faricimab.[99]

129. Respondent concedes that there are "similarities between RhuFabV2 and faricimab's anti-VEGF Fab region", but nonetheless contends that it does not "have the amino acid sequence set forth in Exhibit B".[100]

130. Furthermore, Respondent states that the Tribunal should "examine the entire contract and consider the relation of the parties and the circumstances under which it was executed".[101] Under that light, Respondent contends that the negotiation history of the LCAs supports its position, as only ranibizumab, an isolated antibody fragment, was "on offer" and the parties never intended to negotiate for anything broader than that.

131. Respondent also calls for the parties' course of performance to be taken into consideration, as under New York law, "practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great if not controlling weight".[102]

132. Respondent contests Claimant's contention that all extrinsic evidence is inadmissible to interpret an unambiguous contract.  On the contrary, it suggests that course of dealing evidence is admissible, since the parties' actual performance has long been considered

---

[97] Respondent's Statement of Defence, October 12, 2023, §§ 186, 192.
[98] Respondent's Post-Hearing Reply Brief, July 19, 2024, § 16.
[99] Respondent's Opening Post-Hearing Brief, May 29, 2024, § 17. Respondent refers to *Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Circ. 1997).
[100] Respondent's Statement of Defence, October 12, 2023, §§ 187—188; Respondent's Opening Post-Hearing Brief, May 29, 2024, § 16.
[101] Respondent's Opening Post-Hearing Brief, May 29, 2024, § 18. Respondent refers to *Currier, McCabe & Assocs., Inc. v. Maher*, 75 A.D.3d 889, 890-91 (3d Dep't 2010).
[102] Respondent's Opening Post-Hearing Brief, May 29, 2024, § 18. Respondent refers to *Carthage Tissue Paper Mills v. Vill. of Carthage*, 200 N.Y. 1, 14 (1910).

"the best evidence of the intent of the parties to a contract" and a party's behaviour can be used to contradict its attempt to rebut the plain meaning of a contract.[103]

133. Respondent then goes on to assert that the parties' course of performance over twenty years demonstrate that their collaboration has always been limited to ranibizumab and that full-length antibodies are not covered by the LCAs.[104] Respondent also claims that Claimant became aware of faricimab and of its amino acid sequence long before renegotiating the 2019 LCA, and yet did nothing in the negotiations to address it – Claimant even reduced the scope of its collaboration under the renegotiated Agreement.[105]

134. Respondent asserts that Claimant's interpretation "would treat the phrase 'antibody fragment' – which specifically modifies 'Fab' – as mere surplusage", which would violate New York law on contract interpretation by rendering that provision "meaningless or without force or effect".[106]

b. Faricimab Was Not "Derived by or on Behalf of" Respondent

135. Respondent claims that even if faricimab was indeed covered by section (b) of the definition of RhuFabV2 Antibody, it would still not be a RhuFabV2 Antibody for the reason that it was not "derived by or on behalf" of Respondent, as it was derived by Roche and no one else.[107]

136. First, faricimab was not "derived by" Respondent, as all the evidence allegedly points to the fact that it is Roche which created it. Respondent contends that what this Tribunal should determine is who derived faricimab, and not ranibizumab, as Claimant would have it.[108]

---

[103] Respondent's Rejoinder, February 8, 2024, § 118. Respondent cites *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 329 (S.D.N.Y. 2019), aff'd, 828 F. App'x 84 (2d Cir. 2020) and others.
[104] Respondent's Rejoinder, February 8, 2024, §§ 120—148. Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 111—116.
[105] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 117—145.
[106] Respondent's Statement of Defence, October 12, 2023, § 199; Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 54—55. Respondent cites *Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572 (2017) at 581.
[107] Respondent's Statement of Defence, October 12, 2023, § 213.
[108] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 68—74.



137. Second, Respondent opposes the idea that faricimab was "derived… on behalf" of Respondent, since "New York courts look to agency principles when construing 'on behalf of' in contracts governed by New York law", which in the jurisprudence of the courts of the state means "to connote a direct representative or agency relationship". No agency relationship can be found here, and Claimant has not put forward any evidence to that effect, insists Respondent while stating that it always had an "arm's-length relationship" with Roche.[109]  Furthermore, it has always been Respondent acting on behalf of Roche, not the other way around.[110]

c.   Faricimab Does Not Have the Same Binding Epitope Specificity as RhuFabV2

138. Under the relevant definition in the LCAs, the Fab anti-VEGF fragment must also retain "*the epitope binding specificity of RhuFabV2*".

139. Respondent notes that "to determine whether **faricimab** retains the epitope-binding specificity of RhuFabV2 requires a determination of whether **faricimab as a whole** retains the epitope-binding specificity of RhuFabV2" (Respondent's emphasis); in other words, whether the antibody, and not just a portion of it, retains "the same ability to distinguish one antigen or epitope from another".  It cannot be the case here as by definition, Respondent concludes, "[a] monospecific Fab antibody fragment that only binds VEGF has (…) a different binding specificity than a bispecific antibody that binds both VEGF and ANG-2".[111]

140. It is the epitope binding specificity of the molecule faricimab that must be compared to the epitope binding specificity of RhuFabV2, and on that point, Respondent argues, the Tribunal is forced to conclude that they are different.[112]

---

[109] Respondent's Statement of Defence, October 12, 2023, § 219; Respondent's Rejoinder, February 8, 2024, § 59; Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 2, 75—77. Respondent cites *Riccelli Enters., Inc. v. New York State Dep't of Envtl. Conservation*, 915 N.Y.S.2d 439, 444-45 (Sup. Ct. 2010).
[110] Respondent's Statement of Defence, October 12, 2023, § 220. Respondent's Rejoinder, February 8, 2024, §§ 60, 67; Respondent's Opening Post-Hearing Brief, May 29, 2024, § 77.
[111] Respondent's Statement of Defence, October 12, 2023, §§ 235—238. Respondent's Rejoinder, February 8, 2024, §§ 105—108.
[112] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 86—88.



### 2. Vabysmo® is Not a Licensed Product

141. According to Respondent, the Tribunal should conclude from the fact that faricimab is not a RhuFabV2 Antibody that Vabysmo® is not a Licensed Product under the LCAs.

142. Respondent takes issue with Claimant's characterization of Vabysmo® as a "formulation" of a RhuFabV2 Antibody. "Formulation" has a specific meaning in the pharmaceutical industry and should be understood as a combination of active ingredients and excipients which are necessary to the delivery of the drug to the patient. On this view, Vabysmo® is a formulation of its active ingredient, faricimab, with various excipients. It cannot be a formulation of faricimab's anti-VEGF arm, and does not "contain" ranibizumab as a separate active ingredient.[113]

143. Respondent also argues that faricimab is not "without limitation [a] glycosylated, pegylated or toxin-conjugated form" of a Fab anti-VEGF fragment. These examples have nothing to do with turning a fragment into a full-length antibody in the eyes of the Respondent.[114] It contests Claimant's reliance on the words "without limitation" as it would be "scientifically nonsense" to consider these examples as similar to the formation of full-length antibody.[115]

### 3. Claimant's Argument about Commercial Reasonableness is Detached from Commercial Reality

144. Respondent rejects the notion that its interpretation of the LCAs is "commercially unreasonable". Indeed, while Claimant argues that Respondent could simply add a single amino acid and thus create a new drug outside of the bounds of the LCAs, Respondent counters that this hypothetical does not stand the test of commercial reality, and that it has no economic incentive to "undertake such a circuitous plot".[116]

---

[113] Respondent's Statement of Defence, October 12, 2023, §§ 225—226; Respondent's Rejoinder, February 8, 2024, §§ 91—92; Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 97—107.
[114] Respondent's Statement of Defence, October 12, 2023, §§ 225—226. Respondent's Rejoinder, February 8, 2024, §§ 91—92.
[115] Respondent's Statement of Defence, October 12, 2023, §§ 227—231. Respondent relies on *In re Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1106 (10th Cir. 2017). Respondent's Rejoinder, February 8, 2024, §§ 94, 99—102.
[116] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 89—96.

### 4. Respondent Did not Breach the LCAs

145. Respondent underscores that all of Claimant's claims are based on the same two factual predicates: that faricimab is a RhuFabV2 Antibody, and that Vabysmo® is a Licensed Product. But Claimant has failed to prove these two claims and thus has failed to prove that Respondent has breached any of the provisions contained in the LCAs.[117]

146. Respondent also contends that Claimant's argument concerning the covenant of good faith and fair dealing implied in the LCAs has no merit, as Respondent has done nothing to destroy Claimant's rights.[118] It also notes that the covenant cannot be used to impose an obligation not present in or contemplated by the agreement.[119]



### D. LIABILITY ANALYSIS AND DETERMINATION

### 1. Introduction and Framework

149. In accordance with New York law, the Tribunal interprets and construes the LCAs "in accordance with the will of the parties".[123] In particular, the Tribunal approaches the

---

[117] Respondent's Statement of Defence, October 12, 2023, § 259; Respondent's Rejoinder, February 8, 2024, § 149; Respondent's Opening Post-Hearing Brief, May 29, 2024, § 146.
[118] Respondent's Statement of Defence, October 12, 2023, § 292.
[119] Respondent's Statement of Defence, October 12, 2023, § 296.
[120] Respondent's Statement of Defence, October 12, 2023, §§ 34; Respondent's Rejoinder, February 8, 2024, § 150, 152.
[121] RER-4, Expert Report of ██████████.
[122] Respondent's Post-Hearing Brief, May 29, 2024, § 55 at fn 7.
[123] *Goldman v. White Plains Center for Nursing*, 867 N.Y.S.2d 27 (2008).



will of the parties through the language of the contract, which is the best evidence of the parties' intent.[124]

150. Based on the parties' submissions, the main question put to the Tribunal is whether or not Vabysmo® (or faricimab, or the VEGF binding arm thereof) is a Licensed Product under the LCAs.  Indeed, this determination is the essential prerequisite to the Tribunal deciding whether or not Genentech committed a breach of contract as alleged by Novartis.

151. The Tribunal's decision, as explained in the following sections, is that Vabysmo® (or faricimab, or the VEGF binding arm thereof) is not a Licensed Product under the LCAs.

## 2.   The Wording of the LCAs

152. The Tribunal considers that a textual analysis of the LCAs must lead it to conclude that faricimab, the active ingredient in Vabysmo®, cannot be considered a Licensed Product under the Agreement.

153. The Tribunal takes it as common ground that in its textual analysis the meaning of the word "fragment" is central.  The word is found in sections 1.95 and 1.96 of the LCAs, which define the terms "RhuFabV2" and "RhuFabV2 Antibody" respectively.  They read as follows:



a. The Word "Fragment" Viewed in the Abstract

154. Taking into consideration the parties' submissions and the evidence presented at the hearing, the Tribunal recognizes that the meaning of the term "fragment", read in

---

[124] *Greenfield v. Philles Records, Inc.*, 98 NY 2d 562, 569 (2002).

isolation from the contract, was ambiguous at the time when the LCA was signed in 2003.  The term could designate either (a) an isolated antibody fragment or (b) a given amino-acid sequence, whether found inside or outside a full-length, antibody.[125]

155. Novartis' expert ▇▇▇▇▇, for example, testified at the hearing with respect to fab terminology, as follows:[126]

> *What's – what's interesting is that fab terminology (…) is a terminology that applies both to isolated antibody fragments as well as to the part of the antibody, the arm of the antibody where that sequence is found.*
>
> *So we say the same thing. We call them fab fragments. If we want to be precise, we would say an isolated fab fragment, and that's what ranibizumab is. If we want to talk about the fragment within an antibody, we often say a fab fragment, and we associate it with an antibody.*
>
> *So you say the fab fragment of faricimab. We know what we're talking about, and that's how scientists understand it.*

156. That aspect of ▇▇▇▇▇ testimony is consistent with the acknowledgement made at the hearing by ▇▇▇▇▇, who negotiated the 2003 LCA on behalf of Genentech. He stated:[127]

> *And those things can both be true. So a fragment can be part of a full-length antibody, or it can be isolated from a full-length antibody.*

157. The evidence to that effect was overwhelming.  What the Tribunal draws from this body of evidence was neatly summarized during the cross-examination of ▇▇▇▇▇ by Mr Simes, in the following passage[128]:

> *Q. I may have been imprecise. When we say "antibody fragment," we can be referring to a certain portion of a full-length antibody or something that's not attached to a full-length antibody?*
>
> *A. I believe I have learned that while sitting here, sir.*

---

[125] See Claimant's Response to Respondent's Post-Hearing Brief, July 19, 2024, § 1 ("every fact witness who testified on the subject agreed that a "fragment" could refer to either an isolated fragment or a portion of a full-length antibody").
[126] Hearing Transcript, Vol. 1, 288:2—20.
[127] Hearing Transcript, Vol. 3, 810:17—20.
[128] Hearing Transcript, Vol. 3, 1083:16—22.



158. The passage reflects the crux of the Tribunal's own assessment of this aspect of the evidence.  There is no plain, scientific or industry meaning of the word "fragment" that can be of assistance to us in resolving the fact that it is ambiguous when considered in the abstract.

159. In resolving an ambiguity, as acknowledged by Claimant, the Tribunal may resort to extrinsic evidence.[129]

160. In interpreting the contract, however, we first read it as a whole and interpret words in their textual context.[130]  Thus, the fact that the term "fragment" may be ambiguous when considered in the abstract does not mean it is ambiguous when read in the context in which it appears in the contract.

### b. The Word "Fragment" Viewed in its Textual Context

161. Turning our gaze to the contract, we are guided by the perspective of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business".[131]  We first look to the provisions in which the word "fragment" is embedded with a view to drawing out helpful semantic information.  In doing so we note that the language used in the relevant definitions does not expressly state that the fragment at issue must be isolated.  Nor does the language state that a fragment can be contained in, and form part of, a full-length antibody.

162. In its submissions to this Tribunal, each side presented its own argument that, had the negotiating parties wanted to adopt the meaning now contended for by the other side, it would have been easy to do so expressly, and they did not.  Each party thus competently demonstrated that the provisions could have been drafted in ways that would have made clear the adoption by the negotiating parties of one meaning over the other.

---

[129] Claimant's Reply to Statement of Defence, December 14, 2023, §§ 66, 73.
[130] *HSBC Bank USA v. Nat'l Equity Corp.*, 279 A.D.2d 251, 231 (1st Dep't 2001), noting that sections should be read together contextually (CLA-50).
[131] *Kennedy v. Basil*, 531 F.Supp.3d 828, 841 (2021) (CLA-14).



163. For example, as Claimant stated, it would have been easy enough for the parties to insert the word "isolated" in their definitions to circumscribe the meaning of fragment.[132]  As Respondent suggested, on the other hand, had the parties intended to include full-length antibodies, they could have used – and likely would have – the very same words they had used in their 2000 IgE Agreement (where including full-length antibodies was indeed their intent) and adapted them: "*all* ~~IgE inhibiting~~ antibodies (including fractions or derivatives thereof)".[133]

164. This exercise, which consists in imagining, with the benefit of hindsight, various ways in which the contract might have been drafted, obviously has its limitations. The limitations pertain not only to the knowledge we have which the parties did not, but also to the knowledge the parties had which we do not.  That said, the exercise can at times provide assistance to one who seeks to discover the intent of the parties.  It is particularly appropriate and useful, in our view, when the wording one imagines the parties might have adopted does not add words, but rather subtracts words that are in the contract.

165. A good example would be the following: if the definition of RhuFabV2 was intended to include non-isolated anti-body fragments, why does it refer to anything but RhuFabV2's amino acid sequence?  It is striking, at least to us, that Claimant's proposed interpretation of the term "fragment" makes entirely redundant a significant portion of the words employed in section 1.95, as shown here:



166. The words "**"RhuFabV2"** means … the amino acid sequence set forth in Exhibit B", shorn of all the other words struck out above for demonstrative purposes, convey clearly, succinctly, and precisely the meaning contended for by Claimant in this arbitration.  The Tribunal has difficulty accepting an interpretation of these central provisions of the LCAs which ends up making half of the words in a key section redundant.  Under New York law, a contract must be construed "in a manner which gives effect to each and every part,

---

[132] Claimant's Post-Hearing Brief, May 29, 2024, § 86.
[133] Respondent's Statement of Defence, October 12, 2023, §§ 195, 228.

so as not to render any provision meaningless or without force or effect", and "[c]ourts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreement".[134]

167. Another element of the immediate textual context points in the same direction, in our view.  It will be observed that the parties chose to use the definite article "the" in the definition, which would indicate that they had a particular antibody fragment in mind – the Fab anti-VEGF antibody fragment, "known as RhuFabV2 or ranibizumab".  These latter words are not redundant: they are used to refine the definition and specify the meaning of the term "fragment".

168. Moving outward within the contract, we note, first, that the 2003 LCA has as one of its recitals the following phrase: "Whereas, Genentech has developed a certain molecule known as RhuFabV2 (defined below)".  Although this quote refers to the definition discussed above, the use of the singular "a certain molecule" suggests to the Tribunal that the object of the parties' license agreement was ranibizumab taken as a standalone fragment, which constitutes a single molecule – i.e., a "certain" molecule – according to the evidence before this Tribunal.[135]  When incorporated in a full-length molecule such as faricimab, the fragment itself is no longer a molecule.

169. It was suggested that Claimant acknowledged as much in its pleadings: in the SoC, it is said that "the active ingredient in Lucentis® is ranibizumab, which is the RhuFabV2 sequence as a standalone fragment".[136]  We could, in theory, read the passage as including a comma that Claimant might have intended to place, but inadvertently omitted, after the word "sequence".  However, ████, a witness who testified at the behest of Claimant, contradicted that reading of the SoC in his first written statement:[137]

---

[134] *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit and Cap., Inc.*, 30 N.Y.3d 572, 581 (2017).
[135] See e.g. Hearing Transcript, Vol. 2, 419:16—19 (████ answering Tribunal questions).
[136] Claimant's Statement of Claim, June 20, 2023, § 48.
[137] CWS-2, ████, First Witness Statement, § 23.

> *Novartis and Genentech obtained approval and successfully launched the first*
> *version of* ████, *a solution of ranibizumab (RhuFabV2 as a standalone fragment)*
> *for injection into the eye to treat wet AMD in a vial format.*
>
> (Emphasis added)

170. In our view, these elements hint at a likely scenario in which the object of the license considered by the parties when they contracted was ranibizumab taken as a standalone fragment, and not the amino acid sequence of Appendix B wherever it may be found, including in a full-length antibody such as faricimab.

171. We continue our analysis of the relevant textual context by turning now to another section of the contract which was discussed in the submissions as well as at the hearing. Section 8.1(g) holds in its relevant part as follows:



172. Respondent relied on this section to insist that there is no license under the LCA outside the strict bounds of the relevant definition. This is not particularly helpful, however, unless we can establish what those bounds are.

173. Claimant presented a more persuasive argument concerning section 8.1(g). Claimant said, we think rightly, that the section clearly contemplates scenarios in which there is more than one active ingredient in a Licensed Product. From this observation, Claimant reasons thus: Vabysmo® is a licensed product because faricimab, its "active ingredient," "contains" the RhuFabV2 sequence among other "additional ingredients". The additional ingredients should not deprive the resulting product of its "Licensed Product" status.[138]

174. This aspect of Claimant's thesis is not consistent, however, with the evidence presented to this Tribunal. The evidence demonstrates, in our view, that faricimab is the only active ingredient in Vabysmo®.[139] In other words, Vabysmo® does not contain multiple

---

[138] Claimant's Statement of Claim, June 20, 2023, § 142.
[139] CER-1, ████ Expert Report 1, § 51; CER-3, ████ Expert Report, § 34; RER-1, ████ Expert Report 1, § 154; RER-6, ████ Expert Report 2, § 75; Hearing Transcript, Vol.1, 318:6—12; Vol.4, 1265:23—1266:3, 1475:25—1476:4, 1564:10—18; Exhibit C-84.

active ingredients, including the licensed ranibizumab; there is only one active ingredient, and that is faricimab.

175. Compared to faricimab, ranibizumab is a different molecule and a different active ingredient, as ███████ stated at the hearing:[140]

> ARBITRATOR FELLAS: Okay. Is it your – if you can help with this, within the scope of your expertise, do you understand that the active ingredient of Lucentis is different to the active ingredient of Vabysmo?
>
> THE WITNESS: Yes.
>
> ARBITRATOR FELLAS: Okay. Now, why do you have that understanding?
>
> THE WITNESS: Well, they're two different molecules. And I think the only active ingredient in Lucentis is rhuFabV2. The only active ingredient in Vabysmo is faricimab.

176. Claimant's position was later refined thus: Vabysmo® has indeed one active ingredient, which is faricimab; but this active ingredient has two active "sites",[141] one of them being the licensed ranibizumab.[142]

177. At the hearing, ████████, who testified at the behest of Claimant, gave the following expert testimony:

> ARBITRATOR FELLAS: Am I right that Vabysmo has one active ingredient, faricimab?
>
> THE WITNESS: It has one active ingredient with two active sites.[143]

178. Having carefully reviewed the evidence, we are not prepared to stretch the meaning of the term "active ingredient" so as to include anything on the sub-molecular level, such as non-isolated antibody fragments, "arms" or "sites".  According to the uncontested evidence, the FDA does not label as active ingredients such sub-molecular sequences.[144] The Tribunal has seen no evidence that the concept of "active site" mentioned by █

---

[140] Hearing Transcript, Vol. 4, 1400:3—16. ████████████████████████████████████████████).

[141] Hearing Transcript, Vol. 4, 1475:25—1576:24.

[142] Hearing Transcript, Vol. 5, 1737:14—1738:6.

[143] Hearing Transcript, Vol. 4, 1475:25—1476:4.

[144] Hearing Transcript, Vol. 5, 1862:16—21.

███ has such currency in the scientific community or in the pharmaceutical industry more generally that it would be relevant to our task of elucidating the parties' intent.

179. The conclusion seems inevitable that a "site" or "arm" of a full-length antibody such as faricimab is not understood as an active ingredient even if each of its arms may present characteristics that are similar to corresponding isolated fragments.[145]

180. Similarly, the following testimony was given by ███ at the hearing:[146]

> ARBITRATOR FELLAS: (…) is it fair to say that faricimab is the active ingredient of Vabysmo?
>
> THE WITNESS: That's correct.
>
> ARBITRATOR FELLAS: And is it fair to say that ranibizumab is the active ingredient of Lucentis?
>
> THE WITNESS: That's correct. I can qualify that a little bit by saying that it's the anti-VEGF binding arm of faricimab, which confers the biological activity of the active product.
>
> But I believe, as the FDA considers it, faricimab is the entity they call the active product.

181. In this exchange, ███ does go on to say that this understanding of the term "active ingredient" is one that is associated with FDA practice rather than the scientific community. As there were no scientists present, however, we find that the FDA understanding, which is consistent with the plain meaning of the term "active ingredient" as we understand it, would be the one that was prominent in the minds of those negotiating the LCA at the time.

182. We now turn to another section of the contract that can provide textual context. Section 1.70 of the LCA, which defines "Licensed Product" with reference to "formulation": "a RhuFabV2 Antibody and any formulation thereof (including, without limitation, any

---

[145] ███ confirmed that one of the "arms" of faricimab might present characteristics that are similar to ranibizumab while still being a different active ingredient: Hearing Transcript, Vol. 3, 1304:11—15, together with Hearing Transcript Errata, p. 6. Note that ███ was certainly talking about the VEGF-binding arm of faricimab ("RG7716") and not of ranibizumab.
[146] Hearing Transcript, Vol. 2, 420:17—421:5.

lyophilized solid, liquid, or sustained release formulation containing a RhFabV2 Antibody)."

183. Claimant purportedly relies, *inter alia*, on a "plain meaning" definition of the word formulation. [147]  According to the evidence presented by both sides, however, a "formulation" in this context designates a pharmaceutical product in a form fit for administration to patients.  It consists in active ingredients as well as inactive ingredients which are also called "excipients".  As ███████ explained in his first report:[148]

> *The formulation, or final pharmaceutical product in a form that can be administered to a patient, includes both the active and inactive ingredients. The active ingredient, in this case an antibody, is directly responsible for the therapeutic effect in the patient. The inactive ingredients, or "excipients", serve specialized pharmaceutical functions.*

184. Likewise, ███████ stated:[149]

> *Formulations, or "dosage forms," are the "means by which drug molecules are delivered to sites of action within the body." (…) They consist of an active pharmaceutical ingredient, called an "API" (…) and other nontherapeutic substances.*
>
> (Citations omitted)

185. At the hearing, Claimant suggested, and Respondent denied, that Vabysmo® could be compared to a co-formulation, or a combination product,[150] which is to say a formulation that contains two different active ingredients, such as Tylenol PM®.[151]

186. We recognize that the analogy would have superficial appeal for one who is not familiar with FDA practice, but we are not persuaded.  It is our understanding that Vabysmo® cannot be a combination product because the only active ingredient in Vabysmo® is faricimab.  The Tribunal cannot construe the word "formulation" so as to include ranibizumab as "the" or "an" active ingredient in Vabysmo® without ignoring the

---

[147] Claimant's Response to Respondent's Post-Hearing Brief, July 19, 2024, §§ 59—61.
[148] CER-1, ███ Expert Report 1, § 33.
[149] RER-1, ███ Expert Report 1, § 52.
[150] Hearing Transcript, Vol. 5, 1617:5—1618:1.
[151] Hearing Transcript, Vol. 3, 1061:13—1063:2.



industry understandings that inevitably shaped the drafting of the LCAs. Claimant's argument based on the purported plain meaning of the word "formulation" must be rejected. The plain meaning of that word read in context with the other words of the contract is, in our view, its pharmaceutical meaning.

187. We note that our analysis of what we see as the plain meaning of the terms "formulation" and "active ingredient" in that context will be viewed as consistent with the relevant trade usages. Even if the negotiations were not conducted by individuals with advanced scientific backgrounds, these terms are common in the industry and are familiar to the people with a business background who negotiate these kinds of agreements. We note in passing that this reference to industry usage is consistent with Article 21(2) of the Rules, which states that the Tribunal is to take account "of any relevant trade usages".

188. In conclusion, reading section 1.70 of the LCA in isolation, one might be tempted to stretch the industry meaning of the relevant terms and concede that Vabysmo® is a formulation containing a RhuFabV2 antibody fragment because the fragment is "contained" in faricimab. Likewise, reading section 8.1(g) in isolation, one might also be tempted to do violence to the industry meaning of "active ingredient" by including active "sites" within a molecule – that is to say, the VEGF-binding arm of faricimab. However, under New York law, this Tribunal is bound to interpret words in their textual and factual context.[152] Reading these two provisions together, as well as in light of sections 1.95 and 1.96, we conclude that they cannot inflect the meaning of "fragment" in the way suggested by Claimant.

189. The Tribunal concludes that an analysis focused on the words, understood in the context of the contract viewed as a whole, does not support Claimant's position. While the term "fragment" is ambiguous when viewed in the abstract and outside of the context of the contract, it is not ambiguous when that term is read in the context in which it appears in the contract. The foregoing analysis is sufficient to reach our conclusion. Even if we were to find that ambiguity in the word "fragment" survives an analysis of its context,

---

[152] *Givati v. Air Techniques, Inc.*, 646, 960 N.Y.S.2d 196, 198 (2d Dep't 2013).

we would still find that the extrinsic evidence adduced by the parties point to the same conclusion, as discussed in the following section.

### 3. The Parties' Negotiations and Course of Performance

190. The broader context and history of the negotiations that took place between the parties can legitimately inform our interpretation of the sections of the LCAs.[153]   When interpreting a contract under New York law, the Tribunal may consider the interpretation the parties have themselves given to their contract as well as their course of performance. This is certainly the case where ambiguity is thought to survive a proper textual reading of the contract as a whole.

191. Under New York law, course of performance, in the form of "practical construction by uniform and unquestioned acts from the outset, especially when continued for a long period of time, is entitled to great if not controlling weight, for it shows how the parties who made the contract understood it".[154]

192. Therefore, the Tribunal can take into consideration the parties' course of performance in its interpretation of their contract.   The Tribunal can also delve into the history of the negotiations between the parties in its analysis.   Having considered the history of the negotiation and the course of performance between the parties, the Tribunal cannot accept Claimant's position that Vabysmo® is, or contains, a Licensed Product under the LCA.   We explain why in the following paragraphs.

193. We begin with the context surrounding the negotiation of the Agreement.   Novartis argued that the scope of the LCA should be interpreted in a manner broad enough to incorporate elements that are beyond the RhuFabV2 sequence or the sole ranibizumab molecule.[155]   Indeed, according to Novartis, "the terms of the LCA make clear that the parties entered a broad LCA designed to follow the science wherever it went", "rather than entering an agreement for a single molecule".[156]

---

[153] *Currier, McCabe & Assocs., Inc. v. Maher*, 75 A.D.3d 889, 890-891 (3d Dep't 2010).
[154] *Carthage Tissue Paper Mills v. Vill. of Carthage*, 200 N.Y. 1, 14 (1910). See also *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d 632, 640–41 (S.D.N.Y. 1999).
[155] Claimant's Reply to Statement of Defence, December 14, 2023, § 13.
[156] Claimant's Response to Respondent's Post-Hearing Brief, July 19, 2024, § 40.



194. That the LCA might have been used as a broad framework between the parties regarding new products, however, does not change the fact that new drug discovery would in any event require future negotiations and supplemental agreements, as ███████ acknowledged in his testimony.[157]

195. The evidence presented by the parties rather suggests that their proposed collaboration, while formally set within a broad but standard framework, was very much focused on the antibody fragment ranibizumab. At the hearing, ███████, Claimant's chief negotiator at the time, in agreement with his counterpart ███████, testified: [158]

> *The product on offer was ranibizumab, indeed.*

196. The focus of the parties at the time is otherwise expressed, in the evidence, as ███████, the drug whose active ingredient is ranibizumab.[159] ███████ is what the parties essentially talked about in their meetings under the LCA,[160] and ███████ is what put butter on the bread for both sides of the collaboration.

197. The parties' course of performance is consistent with our reading of the evidence relative to the context of the negotiations. Indeed, when the central objectives of the LCA, that is to say the development and ex-U.S. marketing of ███████, was fulfilled, the parties got back to the negotiating table, in 2019, in order to reduce their obligations with a view to redirecting their resources towards other projects.[161]

198. One aspect of Genentech's argument relying on course of performance was that Novartis knew about Vabysmo® and its active ingredient, faricimab, since at least 2016 and chose not to address this issue in the 2019 renegotiation of the LCA. This should lead the

---

[157] Hearing Transcript, Vol. 2, 672:1—16.
[158] Hearing Transcript, Vol. 2, 623:3-21, 658:25-659:8, 679:8-12; Vol. 3, 790:2-791:17.
[159] See, for example, Exhibit R-293, § 636 (wherein Claimant recognizes that the LCA "only concerns ███████ and not ███████").
[160] See, for example, Exhibit C-29.
[161] Claimant's Statement of Claim, § 70 ("Novartis wanted to leverage more of its ophthalmology resources towards the new ███████ product, and did not wish to continue dedicating the resources necessary for commercialization of the ocular implant product"); CWS-1, ███████, Witness Statement, § 12.



Tribunal to conclude, the argument goes, that Novartis knew and considered that faricimab was not covered by the LCA.[162]

199.  Looking at the possibility that Claimant was aware of the details of faricimab's structure when it renegotiated the Agreement in 2019, we recognize that Claimant failed to clarify for the Tribunal, at the hearing or in its various written pleadings, when exactly it came to learn about faricimab.  We emphasize, however, that what we are considering in this section is the parties' course of performance for the purpose of interpretation, not whether Claimant was somehow estopped from bringing its claim in this arbitration. Indeed, as Novartis noted, Genentech never presented an estoppel or a laches plea.[163] Novartis could well have had serious concerns about Vabysmo® and decided, for its own reasons, not to launch legal proceedings before this arbitration was commenced.  There is nothing illegitimate about this conduct.

200.  Still, whether Novartis knew about faricimab when it renegotiated the LCA is relevant to the analysis of the course of performance argument.  If Claimant knew about Vabysmo® and believed it was infringing on the LCA, it is difficult to explain why it would have gone through the renegotiation process – including the reduction in the scope of the parties' obligations – without raising and addressing the issue.   The issue would have looked significant, we think, ███████████████████████████████████████ ███████████████████████████  These two aspects are not mutually exclusive.

201.  We stress that we do not rely on any information drawn or inferred from Claimant's privilege log (whose entries may indicate if and when legal counsel considered faricimab but whose purpose is not to serve as factual evidence).  Without making any reference to the log or its content, however, we find the evidence clear that Novartis knew about faricimab at the time of the 2019 LCA.  Detailed information about faricimab (then known by the code name RG-7716), including its use of the ranibizumab sequence (with one amino acid substitution) had long been publicly available.  The bispecific structure

---

[162] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 117—145; Respondent's Post-Hearing Reply Brief, July 19, 2024, §§ 81—84.
[163] Claimant's Post-Opening Brief, May 29, 2024, § 157.

of the molecule was described in the Klein paper, in 2016,[164] by Roche scientists who referenced a "tailor-made and optimized VEGF-Ang-2 CrossMab, RG7716" that "was designed specifically for ophthalmology" and included an anti-VEGF Fab based on "ranibizumab."[165]  Numerous other sources provided information about the faricimab structure and it is simply not credible to hold that Novartis would not have followed it as part of its ongoing review of the competitive landscape. ██████, who testified at the behest of Novartis, acknowledged as much in cross examination:[166]



202. Yet, ████████ claimed at the hearing that he first learned only after the 2019 LCA was entered into that faricimab used the ranibizumab sequence.[167]  This aspect of ██ ████ testimony is hard for the Tribunal to accept.  But even if we were to accept this aspect of his testimony, if only for the purpose of discussion, it still says little about the time when other people at Novartis might have learned about it.  On this point, however, we can rely on documentary evidence and we do so rely.  Just a few months after the Klein paper was published in 2016, a Novartis presentation places faricimab ("RG-7716 (bispecific antibody) (Roche)") in an internal competitive landscape analysis.[168]  There can be no doubt in our minds that in 2019, Novartis went into the renegotiation of the LCA with full knowledge of faricimab, and there is no evidence that it so much as alluded to its possible infringement of the contract under renegotiation, the LCA.

203. The conclusion that can reasonably be drawn from the evidence is that Novartis did not understand the LCA to be covering faricimab.[169]  It is a conclusion that we draw.

---

[164] Klein (2016), C-56.
[165] Klein (2016), p. 1012.
[166] Tr. vol. 2, 491:3-9.
[167] Tr. vol. 2, 558:2-9
[168] Brolucizumab (RTH258B) in DME: FDP Proposal, Slide 5, R-124.
[169] See Respondent's Rejoinder, February 8, 2024, §§ 120—148. Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 111—145.



204. We see another aspect of the parties' course of performance as perhaps even more significant, however: the fact that when it signed the first LCA in 2003, Novartis was most definitely aware of Roche's decision to exercise its option relative to bevacizumab (the anti-VEGF antibody that is the active ingredient in Avastin®), pursuant to the Agreement between Genentech, Inc., and F. Hoffman-La Roche Ltd., Regarding Commercialization of Genentech's Products Outside the United States ("Opt-In Agreement").[170]

205. The Roche Opt-In Agreement, which defines Roche's option and its extent, is appended to the 2000 IgE Agreement, an earlier deal signed by the parties to this arbitration.[171] Under the Opt-In Agreement, Roche can exercise a product-by-product option to acquire foreign (ex-U.S.) commercialization rights on any future product developed by Genentech.  The Opt-In Agreement refers to "Products" and "Territories" and has no Field limitations or mention of Field carve-outs.  It defines "product" as "any human pharmaceutical formulation of a compound for which a party has an ownership interest".[172]  The particular document wherein Roche exercises its option relative to bevacizumab, which would indicate if the option had any carve-outs, has not been included in the record before the Tribunal.  However, as will be described below, the parties' course of performance strongly corroborates the idea that the option exercised by Roche regarding bevacizumab was not limited to a particular field or indication, and thus included ophthalmology.  This is significant because bevacizumab would be a licensed product under the LCA if we were to accept Novartis' position in this arbitration, and Novartis had never taken that position before.

206. In his original witness statement, ███████████████ declared that during the negotiations over the 2003 LCA, he made clear to Claimant's representatives that "all full-length antibodies, including bevacizumab (which also binds to VEGF), were excluded from the deal".[173]  During his deposition, ███████████████ was asked "Do

---

[170] R-96.
[171] R-98, 2000 IgE Agreement, Schedule F.
[172] R-96, Opt-In Agreement, art. I.45.
[173] RWS-1, ███████████████, First Witness Statement, § 30.



you recall ever saying in substance, all full length antibodies, not just bevacizumab, are excluded from the LCA?" and he answered that he couldn't recall saying these words.[174] During the lunch break, we learned, ████████████ discussed with Claimant's lawyers and then offered a "clarification" of his statement.[175]

207. The Tribunal is sceptical of ████████████ testimony when he states that bevacizumab was explicitly discussed with Claimant's representatives.   In his deposition, he first stated he could not recall what he said on that point before changing his version after the lunch break.  On this point we can accept ██████████ statement that "bevacizumab was never discussed".[176]

208. Nevertheless, ████████████ witness statements do affirm that Roche's option pursuant to the Opt-In Agreement was to take an exclusive license to Genentech-developed products for commercialization in any indication outside the U.S.[177] That includes, pursuant to the LCAs' language, the relevant Field and Territory. This statement was not the object of a rebuttal by Novartis or its witnesses and the Tribunal accepts ████████████ testimony on this point, noting that it is corroborated █ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████

209. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ █ ██████████████████████████████████

---

[174] ████████████, Deposition, 116:15—116:22.
[175] Hearing Transcript, Vol. 3, 765:4—9; 795:9—796:5.
[176] Tr. 649:14—16, 685:14—18.
[177] RWS-1, ████████████, First Witness Statement, §§ 14—15, 25 ("Although bevacizumab was in development for colorectal cancer at the time, Genentech was aware that it may be possible to develop the product for other indications, including the treatment of ocular diseases—and that Roche's Opt-in rights would apply to all such indications") (emphasis added); RWS-4, ████████████, Second Witness Statement, § 11.
[178] Claimant's Opening Slides, slide 121.
[179] Respondent's Rejoinder, February 8, 2024, §§ 141—148; Respondent's Post-Hearing Reply Brief, 19 June 2024. § 79, at fn 10.
[180] R-293, §§ 63, 748.



210. If Novartis' interpretation of the word "fragment" in sections 1.95 and 1.96 of the LCAs – *i.e.*, one that encompasses all usage of the ranibizumab sequence, including in a full-length antibody – was to be accepted by this Tribunal, then it follows that Novartis could have claimed the exclusive right to commercialize bevacizumab outside of the United States, which, if we rely on the evidence before us, it never did. This may have been for legitimate commercial reasons, which is why the Tribunal does not rest on this observation alone to resolve this dispute. However, according to the theory that it pressed in this arbitration, Novartis also had an obligation under the LCAs, not just a right, to develop bevacizumab – as a Licensed Product – in the Field, and it never did anything of the sort.[182]

211. Furthermore, under the LCAs,[183] ████████████████████████████ ████████████████████████ ████████████████. We have been shown no evidence that Novartis did any such thing, apart from ████████████ use as part of the Joint Management Committee.[184]



---

[181] R-292, p. 37.
[182] See e.g. C-1, 2003 LCA, §§ 2.1; 4.8
[183] C-1, 2003 LCA, § 6.5.
[184] Claimant's Reply to Statement of Defence, December 14, 2023, § 75.
[185] R-292, p. 41.



ICC Case No 27260/PDP – Final Award                                                56



212. 

213. However, it is clear to the Tribunal that these statements are relevant to the examination of the parties' course of performance, since the European briefs must be taken as forming part of Novartis' performance of its obligations under the LCAs to obtain and maintain the relevant regulatory approvals, as should be clear from sections 5.2 and 5.5 of the LCAs:



214. Novartis all but confirms that Roche exercised its option on bevacizumab in a way that does not exclude ophthalmology, when it states in its Post-Hearing Brief that Roche's option regarding bevacizumab, exercised three days after the signature of the 2003 LCA, must yield to the obligations contained and expressed in the LCA.[187]   The point, however, is not which of the two agreements ought to prevail.  The point is that Novartis was aware when the LCA was negotiated that Roche was exercising its option over bevacizumab, a molecule that was accordingly off the table when the LCA was

---

[186] R-116, § 97.
[187] Claimant's Post-Hearing Brief, May 29, 2024, § 96 ("(…) it was not Novartis that would have to yield to Roche's rights, but the converse: whatever Roche received was subject to Genentech's earlier grant of exclusivity to Novartis, as both ▮▮▮▮▮▮▮ and ▮▮▮▮▮ conceded") (emphasis added).

negotiated (even if the option had yet to be formally exercised, which it was 3 days later). The import of this is that the parties never considered that bevacizumab was covered by the LCA's language, as it would be if we were to accept Novartis' position in this arbitration.

215. The Tribunal is satisfied that Novartis acted under the assumption and understanding that bevacizumab was not covered by the LCAs. The evidence shows that Novartis continued to interpret the LCA as excluding Avastin® and bevacizumab in the field of ophthalmology, ██████████████████████████████████████████ ████████████.

216. The crucial point we draw from our course of performance analysis is that when it signed the LCA, Novartis knew that bevacizumab, despite the presence of a ranibizumab-like sequence in it, had not been on offer and was not covered by the LCA. ██████████ testified at the hearing, and the Tribunal accepts his testimony on this point: [188]

> *A. My assumption is that Roche had declined ranibizumab and had made it – must have made it clear, because you don't negotiate one of these agreements in three days, and that Roche had made clear that they were taking up the option on bevacizumab.*

217. It follows that when the LCA was negotiated and signed, Genentech was alive to the fact that it could not agree to a definition of a RhuFabV2 that would comprise bevacizumab, and Novartis was aware of Roche's option on bevacizumab, including in the field of ophthalmology.

218. In interpreting the contract, we rely on the most logical explanation available to us – that Novartis knew that bevacizumab was reserved for Roche. The parties knew that bevacizumab would have been swept under the definition of ranibizumab had the latter been defined exclusively through its amino acid sequence, as opposed to being defined via its molecular structure as a fragment.

---

[188] Hearing Transcript, Vol. 3, 1099:12—18.

ICC Case No 27260/PDP – Final Award                                                    58

219. The representations made by the parties at the time they signed the 2003 LCA – contained in its section 16 – are also of interest. Section 16.2 reads as follows:



220. As we determined above, when Novartis signed the 2003 LCA, it was aware of Roche's option on bevacizumab.  Section 16.2 should be read in this light: Genentech represented that the LCA was not in conflict with Genentech's obligations to Roche at a time when Novartis was in possession of the Opt-In agreement and therefore knew what those obligations were.  The basis of the representation was known to both parties, who we assume – it is not disputed – acted honestly.  To be consistent with that representation, the word "fragment" must be interpreted narrowly.  Even before the exercise of the option by Roche, Genentech had a contractual obligation to Roche known to Novartis that was, on Novartis' case, in conflict with the LCA.

221. In conclusion, the parties' course of performance regarding the LCA's relation to Avastin® and bevacizumab strongly supports the conclusion that the word "fragment" in sections 1.95 and 1.96 must be interpreted to designate only isolated fragments and that faricimab, including its VEGF-binding arm, is not covered.

**4.   A Commercially Reasonable Interpretation**

222. Whether or not reference is made to extrinsic evidence, under New York law, a contract should not be interpreted "in a commercially unreasonable manner or contrary to the reasonable expectations of the parties".[189]

---

[189] *HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 826 N.Y.S.2d 190, 196 (1st Dep't 2006), CLA-48. See also Claimant's Statement of Claim, June 20, 2023, § 120, referring to *Matter of Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003); Respondent's Statement of Defence, November 12, 2023, § 172, referring to *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 54 (1st Dep't 2015).



223. Novartis argues that under Respondent's proposed interpretation of the LCA, Genentech would be free to add inconsequential and minor elements to ranibizumab and then be able to profit from it by avoiding its obligations under the LCAs.[190] Respondent counters that this hypothetical bears no relation to commercial reality, and that it has no economic incentive to "undertake such a circuitous plot".[191]

224. In the final analysis, this is probably Novartis' best argument: Genentech's proposed interpretation allows it to do something indirectly which it could not do directly. Genentech could not use ranibizumab in the Field as a molecule without paying royalties to Novartis. Yet by incorporating (through Roche, it is argued) what is essentially ranibizumab's amino acid sequence as an arm of a larger, bispecific molecule which, in effect, replicates what ranibizumab does as a stand-alone fragment, Genentech can benefit from the licensed product without paying the royalties. This might be viewed as a possible violation of the covenant of good faith and fair dealing, or as a result that cannot be countenanced because it is commercially unreasonable.

225. This high-level argument gave the Tribunal pause. One might well characterize what actually transpired as an example of the "gamesmanship" that the parties admittedly wanted to avoid when they entered the LCA.[192] Looking at the argument more closely, however, we conclude that it cannot carry the day. There are two main reasons for dismissing it.

226. First, the notion that Genentech's proposed interpretation is commercially unreasonable when the ranibizumab collaboration brought billions in revenue to both parties is difficult to accept.[193] That collaboration was coming to an end in 2019, as the parties recognized when they entered 2019 LCA with a view to diverting more resources to other projects. By any measure that collaboration had been a tremendous success. For Novartis to now

---

[190] See e.g. Claimant's Statement of Claim, June 20, 2023, § 156.
[191] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 89—96.
[192] Claimant's Response to Respondent's Post-Hearing Brief, July 19, 2024, § 89.
[193] Respondent estimates that Claimant's revenues from the agreement amounted to ███████ , based on Royalty Statements. See Genentech's Closing Presentation, September 3, 2024, penultimate slide, with references.



seek a new lease on this collaboration, at no cost to it other than litigation costs, does not evoke commercial reasonableness in our minds.

227. The argument from commercial reasonableness wrongly assumes that all Genentech had to do to profit from ranibizumab without paying royalties was to "stick it into a larger molecule" and sell it. That assumption – ironically, given the argument's invocation of commercial reasonableness – is entirely untethered from the commercial realities of the pharmaceutical industry. Getting a new drug to market is nothing like sticking a small molecule into a larger one and selling it. It is a long and arduous process involving time and cost-intensive research and regulatory processes that can easily take as long as 10 years of dedication and investment, without guarantee of success.[194] Given the expiry of the patents over the licensed technology, it defies logic to imagine Genentech and Roche conspiring, at great cost, to get the benefit of ranibizumab without paying royalties when everyone and their cousins can now produce a generic equivalent at low cost and freely sell it practically anywhere. There is no doubt in our mind that Vabysmo® was conceived as a new molecule, a new active ingredient, the success of which would overtake older products whose effectiveness depended exclusively on their VEGF-binding properties. The fact that the ANG-2 arm of faricimab might be turning out to be less effective than Roche had anticipated changes nothing to its development and its design structure as a new, full-length molecule.

228. Second, the argument depends on an approach to contract interpretation that would have us ask "what the parties would have wanted had they known what we now know". In our view, applying that approach in this case is incorrect because no ambiguity survives a proper reading of the term "fragment" in context, and even if it did, as we demonstrated, it would not survive analysis in light of the extrinsic evidence. The approach is also problematic because the proper allocation of risks inherent in contract law relies in principle on what the parties jointly did intend in light of the knowledge they had at the time the contract was made.

---

[194] Respondent's Opening Post-Hearing Brief, May 29, 2024, §§ 90—92.

229. In this case, it is common ground that the parties were proceeding under the assumption that smaller molecules had greater promise and potential for success in the ocular field than larger molecules.  To be sure, the basis for this assumption was eventually eroded over time, ███████████████████████████████████████████ █████████████ ███████████████████████████████████████████████████████████████ ████████████  At the time of the 2003 LCA, however, no one was particularly interested in pursuing the development of full-length molecules for use in the eye.  That is what the parties knew and what motivated them at the time of contracting.  Accordingly, a smaller molecule, a stand-alone fragment, is what they were interested in, and what they contracted for.

230. To project ourselves out of this context and ask what the parties would have intended or done ███████████████████████████████████████████████████████████████, and thus to interpret the contract in light of information the parties did not have, is, in our view, inappropriate in this case.  Contract law allocates the risks inherent in the combination of our inability to predict the future, and our need and willingness to make binding and enforceable commitments in the face of uncertainty.  To ask, and to answer, what the parties would have done had they known the future (which is now the present), and to enforce those answers in lieu of the contract they actually made, would be a failure to take these commitments seriously.  It is that failure that would be commercially unreasonable because commerce is completely dependent on the recognition and enforcement of contractual commitments.  The parties who made this contract were looking at the field of ocular diseases and were not interested in full-length antibodies.  They contracted as a result for something specific: the small, stand-alone fragment known as ranibizumab.

231. There is no quick and easy heist involved in Genentech's interpretation of the LCA, we conclude, and no violation of the covenant of good faith and fair dealing.  There is no "gamesmanship" involved in Genentech's involvement with faricimab that might run afoul of the covenant of good faith and fair dealing, and we see nothing commercially unreasonable flowing from Genentech's interpretation, which we adopt.



### 5. Conclusion

232. We accordingly find in favour of Genentech: the fragment that is licensed under the LCA is the stand-alone ranibizumab: Vabysmo®, faricimab, or the VEGF-binding arm thereof, are not covered by the LCA.  Claimant has failed to establish a breach of the LCAs.  The remedy it seeks, "that the Tribunal declare Vabysmo® (faricimab) to be a Licensed Product under the LCA and that Genentech has breached and will continue to breach the LCA by encroaching on Novartis' exclusive Territory, including by seeking regulatory approval of, using, selling, importing, and/or promoting Vabysmo® in countries outside the United States" [195] is therefore denied.  Respondent seeks a declaration "that Vabysmo® (faricimab) is not a Licensed Product under the LCA", which is granted.  Respondent also initially sought a broad declaration "that Genentech did not breach the terms of the LCA".[196]  To the extent this prayer for relief was not abandoned, it exceeds the scope of the dispute before us and must accordingly be denied.

### 6. Outstanding Issues, and Second Phase

233. In light of this conclusion, the Tribunal need not examine the other issues raised in these proceedings, including, but not limited to, whether or not faricimab was "derived by or on behalf" of Genentech, and whether Claimant's interpretation should be avoided as a matter of New York law ███████████████████████████████████ ████████████████████████████

234. Likewise, our conclusion that there is no liability for breach removes any need for a second phase to address remedies in this arbitration.  As cost submissions have been filed, this Award puts an end to these proceedings.

235. The Tribunal now turns to costs.

---

[195] Claimant's Reply to Statement of Defence, December 14, 2023, p. 61.
[196] Terms of Reference, § 48.



## V.     COSTS

### A.  PRINCIPLE

236. Article 38 of the Rules provides in relevant parts:

> *1) The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*

> *[...]*

> *4) The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*

> *5) In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.*

237. These provisions of the Rules are consistent with the LCAs, which also explicitly empower the Tribunal to award costs as it determines appropriate.  Section 15(2) of the 2003 LCA and Section 14(2) of the 2019 LCA provide: ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

238. The seat of this arbitration is Washington, D.C., U.S.A.  There is no impediment in the law of the seat to the application of these contractual provisions.  Interpreting the *Federal Arbitration Act*, federal courts have held that arbitrators may award attorneys' fees to the prevailing party where, as here, the parties have empowered the Tribunal to do so in their arbitration agreement or by incorporation of arbitral rules that permit cost allocation.[197]

239. We proceed based on the broadly shared assumption in international commercial arbitration practice that costs should follow the event unless there are reasons for the arbitrators to find otherwise.  In this case we note that Genentech has succeeded in fully

---

[197] *See, e.g.,* RLA-109, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.,* 564 F.3d 81, 88-89 (2d Cir. 2009).

defending against Novartis' claim.  Therefore, Genentech should in principle recover from Novartis the costs it reasonably incurred in defending the claim.

240. We now turn to our analysis.

## B. ANALYSIS

241. Genentech claims US$ 17,870,928.62 for its legal and other costs relating to Phase I of this arbitration.  The costs it claims are summarized below and broken down to reflect the detail provided in an appendix to the cost submission:

| Category | Amount |
|---|---|
| ICC Costs | $615,000 |
| Legal Fees | $15,387,023.12 |
| Expert Costs | $849,996.79 |
| Disbursements | $1,018,908.71 |
| **TOTAL** | **$17,870,928.62** |

242. On any measure, the amounts are not modest, considering that they are for just one of possibly two phases in this arbitration.

243. Genentech explains in its submission that the costs are reasonable in the context of the dispute.  As part of this context, Genentech highlights the following:[198]

> *The stakes could not have been higher for Genentech. While the parties cooperated in the conduct of the proceedings with little need for Tribunal intervention, a dispute of this magnitude necessarily involved complex factual and legal issues. The factual issues concerned not only the history of the parties' collaboration, including its negotiation history and the parties' twenty-year course of performance, but also the development and commercialization of Vabysmo® and the relationship between Genentech and Roche. By its very nature, the dispute implicated complex scientific issues concerning antibody engineering at the cutting edge of drug development. The legal issues included not only matters of New York contract law, but also issues concerning the scope of the Tribunal's jurisdiction, corporate vicarious liability, the rights of third parties like Roche, IP and patent law, and the anti-competitive consequences of Novartis's contractual interpretation.*
>
> *Given the high stakes of this dispute, the parties engaged in robust advocacy, with two rounds each of pre-hearing merits briefing, four depositions (all of which required travel), multiple expert reports on each side, a four-day hearing involving*

---

[198] Respondent's Cost Submission, 24 October 2024, pp. 2—3.



> examination of twelve witnesses, two rounds each of post-hearing briefing, and closing arguments. Genentech also needed to respond to shifting arguments put forward by Novartis. Taken together, Genentech's costs are more than reasonable in view of the highly complex fact and legal issues, the technical subject matter, the stakes of this arbitration, and Novartis's changing positions.

244. Also relevant to the determination of reasonableness are factors detailed by Novartis in its own cost submission, namely, in addition to the amounts at stake and the complexity of the matter: the size, global reach and caliber of the firms, the location where the case was litigated, here, *de facto*, New York City, the rates charged in similar circumstances by comparable firms, and the willingness of the clients to pay those rates.[199]

245. We accept that the rates charged by the firms are comparable and that they do not overreach when considered in the context of the dispute and the relevant market.  We also note that in the experience of this Tribunal, the level of sophistication and quality of advocacy in this arbitration were as high as can be had anywhere.

246. Time spent can also be important, however, and Novartis strenuously objects to the hours billed by Genentech's lawyers.  Considering that in terms of filings, document production and hearing preparation Genentech and Novartis faced similar burdens, it is noteworthy that counsel for Respondent claims 18,824.4 hours when Claimant's counsel claim "merely" 8,013.4 hours.  The difference between the two figures is striking indeed. Claimant takes issue particularly with the fact that "Genentech's counsel incurred nearly $18 million in fees despite applying a "substantial" discount—from both discounted hourly rates and a volume discount—across all of their work in the arbitration".[200] Instances of "excessive attorney time" volunteered as examples by Novartis include 5,424.2 hours over the course of two-and-a-half months on the Statement of Defence (for which 19 attorneys claim hours, including many senior attorneys claiming 300-500 hours each over that period); and 1,935.9 hours spent by 23 attorneys on an unexplained "Fact Investigation and Case Analysis."

---

[199] Claimant's Application for Attorney's Fees and Costs, October 24,  2024, pp. 2—3.
[200] Claimant's Opposition to Genentech's Application for Attorney's Fees and Costs, November 7, 2024, p. 2.

247. To be sure, we find all of this to be of some interest.  Yet it is of limited import for our purpose.  The reason is that Novartis opted not to disclose the full amount of time that its attorneys have worked on the arbitration.  In its costs submission, Novartis states that the amount it seeks is "far less than the fees Novartis actually paid."[201] Novartis elected not to request, and as a result not to disclose to this Tribunal, any fees for work on its Request for Arbitration or for any procedural work, including the preparation and negotiation of the Procedural Timetable and Confidentiality Orders and selection of the Tribunal.  In addition, significant discounts have been applied, as much as 40% on lead counsel rates, such that Novartis has ultimately deprived the Tribunal of the comparative basis it would need if it were properly to assess Claimant's objection.

248. Claimant similarly objects to Genentech's disbursements which it says – we assume for rhetorical effect – are 5.5 times higher than the amount sought by Novartis. [202]

249.  Again, this is essentially a result of Claimant opting not to seek its contribution to ICC costs in the amount of US$ 615,000.  The comparison is therefore unavailing.

250. Claimant, finally, argues that Genentech's procedural conduct in these proceedings made the arbitration more costly.  One complaint is Genentech's promotion of a structure involving two full rounds of sequential briefings.  This, we note, is standard practice.  Another complaint is the insistence on in-person depositions involving transatlantic attorney travel.  While depositions are not standard arbitral practice, they were agreed upon by the parties.  To hold them in person, given the stakes, was in our view reasonable.

251. We conclude that Genentech should be allowed to recover its costs as stated.  A margin of flexibility should be allowed, we think, to a party defending a claim such as this, where the stakes are very significant indeed, and Claimant has little to lose except its costs.

---

[201] Claimant's Application for Attorney's Fees and Costs, October 24, 2024, p. 3.
[202] *Ibid.*



### C. Breakdown and Interest

252. The costs of the arbitration may conveniently be broken down into (1) the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, and (2) party costs.

253. Concerning the first item, at its session of January 30, 2025, when this Final Award was approved, the arbitrators' fees and expenses and the ICC administrative expenses were fixed at a total amount of US$ 1,168,500. Each party is seeking reimbursement of its advance of US$ 615,000. In the final account, after reimbursements, each of the parties will have advanced US$ 584,250 toward the ICC costs. This amount is granted to Genentech.

254. The balance of Genentech's claim is also allowed, in the amount of US$ 17,255,928.62.

255. Together with the ICC costs, the claim is therefore allowed in the total amount of US$ 17,840,178.62.

256. Genentech is also seeking interest "at the New York statutory rate of nine percent pursuant to C.P.L.R. § 5004, running from the date of the [Award] until full and final payment". Novartis has not commented on that request, and we agree that interest should accrue on our award of costs. Concerning the rate, we note that Novartis has not objected to the 9% rate, or to it being set by reference to New York's C.P.L.R. We also note that the rate is lower than, but comparable to, the contractual rate set for other purposes at Section 9(g) of the LCA in the event of "any delay in payments by Novartis to Genentech". Section 9(g) refers to "the prime rate as reported in the U.S. Federal Reserve H.15 Bulletin, or any successor bulletin thereto, plus two percent (2%)", which currently comes to a total of 9.5% annually. This give us confidence that the 9% rate is within a range that was in the Parties' contemplation. We will accordingly order interest at the requested rate of 9% from the date of this Final Award until full and final payment (subject to any order by an enforcement court applying its own rules to post-judgment interest).



## VI.    MAJORITY AND DISSENT

257. In accordance with Art. 31 of the Rules, this Final Award is made by a majority decision. One co-arbitrator, Robert S. Smith, disagrees with the majority's interpretation of the LCAs.  He finds, *inter alia*, that the ambiguity in the term "fragment" and the possible circumvention by Genentech of the LCAs "general purpose", taken together, should lead the Tribunal to adopt Claimant's proposed interpretation.  He also finds that faricimab was "derived by or on behalf of" Genentech and is, or contains, a Licensed Product.  The dissent was taken into account, and is partly reflected, in the reasons for this Award.  The majority is not persuaded by the dissent's reliance on the "purpose of the LCA", the determination of which ultimately depends on the definition of "Licenced Product" and, in turn, the meaning of "fragment" when read in its proper context.  On its proper reading, the LCA had a narrow purpose that left no scope for a loophole.

## VII.    FINAL AWARD

258. For the foregoing reasons, the Tribunal:

**DECIDES that it has** jurisdiction over the present case;

**DECIDES and DECLARES that Vabysmo® (faricimab) is not a Licensed Product under the LCA;**

**DENIES** Claimant's claim for breach of contract;

**ORDERS** Novartis to pay to Genentech the costs it incurred for the arbitration, including attorneys fees, as follows:

- US$ 584,250 for the advance on the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court;

- US$ 17,255,928.62 for the reasonable legal and other costs incurred for the arbitration;



**ORDERS** Novartis to pay to Genentech interest on these amounts at the rate of 9% annually from the date of this Final Award until full and final payment, subject to any order by an enforcement court applying its own rules to post-judgment interest.

**DENIES** any other relief.

## VIII.  SIGNATURE

259. As contemplated in paragraph 15 of the Terms of Reference, this Final Award is duly signed in counterparts and assembled in a single electronic file constituting the original.

*Place of Arbitration: Washington, D.C., United States of America.*

Date:

_____
John Fellas
Co-Arbitrator

_____
Robert S. Smith
Co-Arbitrator
*(dissenting)*

_____
Fabien Gélinas
President



**ORDERS** Novartis to pay to Genentech interest on these amounts at the rate of 9% annually from the date of this Final Award until full and final payment, subject to any order by an enforcement court applying its own rules to post-judgment interest.

**DENIES** any other relief.

## VIII. SIGNATURE

259. As contemplated in paragraph 15 of the Terms of Reference, this Final Award is duly signed in counterparts and assembled in a single electronic file constituting the original.

*Place of Arbitration: Washington, D.C., United States of America.*

Date:

_____                                _____
John Fellas                                              Robert S. Smith
Co-Arbitrator                                            Co-Arbitrator
                                                         *(dissenting)*


_____
Fabien Gélinas
President



**ORDERS** Novartis to pay to Genentech interest on these amounts at the rate of 9% annually from the date of this Final Award until full and final payment, subject to any order by an enforcement court applying its own rules to post-judgment interest.

**DENIES** any other relief.

## VIII. SIGNATURE

259. As contemplated in paragraph 15 of the Terms of Reference, this Final Award is duly signed in counterparts and assembled in a single electronic file constituting the original.

*Place of Arbitration: Washington, D.C., United States of America.*

Date:

_____                          _____
John Fellas                                                          Robert S. Smith
Co-Arbitrator                                                       Co-Arbitrator
                                                                          *(dissenting)*

_____
Fabien Gélinas
President

## DISSENTING OPINION

I respectfully dissent. I would decide the liability issue in favor of Novartis, and would proceed to the second phase of the arbitration.

I agree with the majority that the "the meaning of the word 'fragment' is "central" to this case (Award ¶ 153), and also that the term is ambiguous (*id.* ¶ 154). It can refer either to an isolated antibody fragment, or to a fragment that is part of a full-length antibody. In resolving the ambiguity, a tribunal should select the interpretation that will "give effect to [the contract's] general purpose" (*Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, 325 (2007) and that "best accords with the sense of the remainder of the contract" (*Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347-348 (1955)). In other words, it is appropriate to ask, in cases of ambiguity, which of the alternative readings the parties would have chosen had they anticipated the question now presented.

This approach, called "incorrect" by the majority (Award ¶ 228), is an accepted one in New York law. *E.g., Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 320 (1989) ("the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject"). The majority's preferred approach, to ask "what the parties jointly did intend" will generally fail, as I

believe it does in this case, because usually the answer is that they did not jointly intend anything. Usually, in such cases, the parties did not actually think about or discuss the issue. If they had, the agreement would not be ambiguous, because the parties would have clearly expressed their joint intention.

A consideration of the "general purpose" of the LCA leads me to the conclusion that the broader meaning of "fragment" is consistent with that purpose, and the narrower one is not.

The purpose of the LCA is not hard to discern: it was to give Novartis the exclusive right to distribute the "Licensed Product" in a specified territory and field, in exchange for agreed-on payments from Genentech. The majority, summarizing what it thinks may be Novartis's best argument, explains why to adopt the meaning of "fragment" favored by Genetech permits this purpose to be defeated:

> Genentech's proposed interpretation allows it to do
> something indirectly which it could not do directly.
> Genentech could not use ranibizumab in the Field as a
> molecule without paying royalties to Novartis. Yet by
> incorporating (through Roche, it is argued) what is
> essentially ranibizumab's amino acid sequence as an arm
> of a larger, bispecific molecule which, in effect,
> replicates what ranibizumab does as a stand-alone
> fragment, Genentech can benefit from the licensed
> product without paying the royalties.

2

Award ¶ 224.

I find this argument more persuasive than the majority's refutation of it. More specifically, I am unpersuaded by the majority's point that the incorporation of a fragment into a larger molecule is time-consuming and expensive, and thus not a "quick and easy heist." *Id.* ¶¶ 227, 231. The time and expense were plainly justified by the reward, and a heist that is slow and difficult is still a heist.

Thus I think the majority, having correctly found the term "fragment" to be ambiguous, should have considered which meaning is more consistent with the evident purpose of that agreement before, rather than after, searching the text for "helpful semantic information" (*id.* ¶ 161) and scrutinizing the extrinsic evidence. Once it is understood that one of two possible interpretations better serves the purpose of the agreement, only the clearest evidence should persuade a tribunal that the parties intended the other meaning. In my opinion, the evidence relied on by the majority comes nowhere near to proving that the parties intended the more restrictive meaning of "fragment." I think the majority's arguments have several flaws, but I will not offer a detailed critique, because I think these arguments, even if meritorious in themselves, are not weighty enough to justify an interpretation that leaves a large loophole in the LCA.

3

I am also satisfied by the evidence that faricimab was "developed by or on behalf of Genentech," and is, or contains, a "Licensed Product" as the LCA defines that term. Accordingly, I would resolve the liability phase of this case in Novartis's favor.

Date: April 14, 2025

Robert S. Smith

Co-Arbitrator

4